No. 22-35068

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ROBERT MCLAFFERTY,

*Petitioner-Appellant,*

v.

DEPARTMENT OF VETERANS AFFAIRS; ET AL.,

*Respondents-Appellees.*

On Appeal from the United States District Court
For the District of Oregon
No. 3:20-cv-1487-MO
Hon. Michael W. Mosman

---

## APPELLLANT'S OPENING BRIEF

---

JOHN A. BAKER
Baker, Baker  & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:      (217) 522-3445
E-mail:      jab@bbklegal.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... 2

TABLE OF AUTHORITIES ............................................................. 6

INTRODUCTION ............................................................................. 8

JURISDICTIONAL STATEMENT .................................................. 10

STATEMENT OF THE CASE ........................................................ 12

    I.      Factual Background ................................................... 12

          A.      Structure of the Department of Veterans Affairs..................................................................... 12

                  1.  The Veterans Health Administration (VHA) 12

                  2.  VA Northwest Health Network (VISN 20) ..... 13

                  3.  The VA Portland Health Care System (VHAPOR) ............................................................. 14

          B.      Dr. Michael Wheatley is temporarily removed from his position and has his medical privileges summarily suspended. ............................................. 16

          C.      Dr. Wheatley files an EEO complaint with the VA..................................................................... 19

          D.      Dr. Wheatley's ongoing issues handling call coverage for Plastic Surgery. ................................... 20

                    1.  Dr. Edwards' concerns about Dr. Wheatley and his failure to work to get call coverage for Plastic Surgery............................................. 20

2. Call Issues continue when Dr. McLafferty became Chief of Surgery. ................................... 22

E. Dr. Wheatley's 2014 Service Chief evaluation. ... 24

F. Dr. Wheatley's Rating on October 27, 2014 .......... 26

G. VHAPOR's handling of Dr. Wheatley's EEOC claims. ....................................................... 28

H. VHAPOR proposes terminating Dr. McLafferty's employment. ............................................. 32

I. VHAPOR's attempts to secure a call contract for Plastic Surgery. ....................................... 34

1. Relationship Between OHSU and VHAPOR . 34

2. Dr. Anderson and Dr. Edwards attempt to secure call coverage for Plastic Surgery. ....... 34

3. Dr. McLafferty is directed to continue Dr. Edwards' work of getting OHSU to handle call coverage for Plastic Surgery. ................... 36

J. Dr. McLafferty's job performance at VHAPOR . . 39

II. Procedural Background ..................................... 41

A. Dr. Misra recommends Dr. McLafferty's termination. ................................................ 41

B. Dr. McLafferty filed a timely response to Dr. Misra's charges. ....................................... 44

C. Director Goodspeed terminates Dr. McLafferty's employment. ............................................. 44

D. Dr. McLafferty Files a formal grievance pursuant to VA policy. ................................. 45

E.   Procedures leading up to the grievance
     hearing...........................................................47

F.   Post-hearing issues and delays. ............................49

G.   Michael Murphy upholds Dr. McLafferty's
     termination on March 6, 2020.................................51

SUMMARY OF THE ARGUMENT.......................................52

STANDARD OF REVIEW.....................................................54

ARGUMENT...........................................................................57

I.   Throughout these proceedings the VA completely
     ignored Dr. McLafferty's procedural rights and its
     own statutorily mandated rules. ....................................57

     A.   Dr. McLafferty was not provided with a complete
          copy of all evidence that provided the
          justification to terminate his employment. ........58

     B.   The VA completely failed to comply with its
          grievance procedure.................................................63

II.  There is insufficient evidence that would allow a
     reasonable person to conclude that Dr. McLafferty
     violated the policies he was accused of violating.......66

     A.   Dr. McLafferty did not engage in a prohibited
          conflict of interest....................................................68

     B.   There is nothing in the record that suggests
          that Dr. McLafferty retaliated against Dr.
          Wheatley. ....................................................................72

          1.   The "Service Chief Evaluation" was not
               retaliatory. ..................................................74

2.  The October 27, 2014, rating was not retaliatory. .......................................................... 75

III.  Even if Dr. McLafferty had violated any rules his termination was not appropriate. ................................... 76

CONCLUSION .......................................................................... 79

# TABLE OF AUTHORITIES

## Cases

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97, 104 S.Ct. 439, 444 (1983) ........................................... 55

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)................................................................................................. 55

*Dubnow v. McDonough*, 30 F.4th 603, 609 (7th Cir. 2022) ................... 56

*Helman v. Dep't of Veterans Affairs*, 856 F.3d 920, 923 (Fed. Cir. 2017) ............................................................................................................ 54

*Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) ............. 73

*McClaskey v. United States Dep't of Energy*, 720 F.2d 583, 586 (9th Cir. 1983)................................................................................................... 56

*NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501 (1939) ...................................................................................... 56

*Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798, 116 S. Ct. 1761, 1765 (1996)............................................................................................ 62

*Rodriguez v. Department of Veterans Affairs*, 8 F.4th 1290, 1297 (Fed. Cir. 2021) ............................................................................................... 66

## Statutes

28 U.S.C. § 1631 ................................................................................... 10

38 U.S.C. § 713 .............................................................................. passim

38 U.S.C. § 7302 ................................................................................... 34

38 U.S.C. § 8153 ................................................................ 34

5 U.S.C. § 7703 ................................................................. 55

5 USC § 2302 .......................................................... 42, 43, 67

**Rules**

Fed.R.App.P. 4 ................................................................... 11

**Regulations**

5 C.F.R § 2635.402............................................. 41, 67, 68, 69

## INTRODUCTION

Dr. Robert McLafferty was employed by the United States Department of Veterans Affairs (the "VA") as the Chief of Surgery at its Portland Health Care System (VHAPOR). One of his subordinate employees, Dr. Michael Wheatley, was temporarily removed from service because his wife had been writing significant numbers of narcotics prescriptions in his name. Once he was reinstated, Dr. Wheatley filed a complaint with the EEOC alleging that he had been perceived as disabled.

Dr. McLafferty played no role in the decision to temporarily removing Dr. Wheatley. That decision was made by others, including VHAPOR's legal counsel. When Dr. Wheatley brought is complaint VHAPOR apparently decided it did not want to comply with its discovery obligations. That decision proved to be legally catastrophic for the VA because the ALJ sanctioned VHAPOR and effectively didn't allow them to rebut Dr. Wheatley's claims. He was granted summary judgment and received a significant finding in his favor.

Despite the fact that Dr. McLafferty had no involvement in the decisions that lead to the *Wheatley* decision, the decision was made that he needed to pay the price and his employment was terminated.

Dr. McLafferty's termination is flawed in multiple respects. The procedures that were used before and during the process were flawed and in violation of the VA's policies and federal law. VHAPOR's "decision-makers" took their instructions from others without receiving the relevant materials that would enable them to make an independent assessment nor were those materials provided to Dr. McLafferty for him to be able to mount an appropriate defense.

The facts that were ultimately relied upon to terminate Dr. McLafferty do not demonstrate that he violated policy – even after new charges of a conflict of interest were added years after the events had occurred.

Finally, Dr. McLafferty's job performance had always been outstanding and there was no justification to terminate his employment based upon the actual evidentiary record.

## JURISDICTIONAL STATEMENT

On April 22, 2020, Dr. McLafferty filed a petition for administrative review with the United States Court of Appeals for the Federal Circuit. (Fed. Cir. Case No. 2020-1772). That petition was brought under 38 U.S.C. § 713(b)(5). On August 31, 2020, the Federal Circuit issued an order finding that jurisdiction to entertain Dr. McLafferty's case was proper in the district court and transferred the case to the District of Oregon pursuant to 28 U.S.C. § 1631. (Fed. Cir. Doc. 10). The administrative review petition raised a federal question and the district court had jurisdiction to hear the case under 28 U.S.C. § 1331.

On November 22, 2021, the parties appeared before Judge Michael W. Mosman and presented oral arguments on their respective motions for summary judgment. 1-ER-5-51. At the conclusion of the arguments judge Mossman found in favor of the VA and against Dr. McLafferty. 1-ER-3. On January 20, 2022, judgment was entered in favor of the VA and against Dr. McLafferty. 1-ER-2. Dr. McLafferty filed a notice of appeal on January 21, 2022. 6-ER-1371. The judgment of the district court constitutes a "final decision" under 28 U.S.C. § 1291 and this

court has jurisdiction to entertain this appeal pursuant to Fed.R.App.P.

4(a)(1)(A).

## STATUTORY AUTHORITIES

Pertinent statutory authority is reproduced in the addendum.

## ISSUES PRESENTED

Dr. McLafferty brings this administrative review petition

challenging his termination from the VA. The questions that are

presented are:

1.  Given that the statute requires the VA to observe certain procedures, when legally mandated procedures are completely ignored can the decision to terminate an employee stand?

2.  When the record is devoid of sufficient evidence to support the conclusion that Dr. McLafferty violated VA policies can a termination stand?

3.  When an employee has performed as he had been directed by his supervisors is there cause to terminate his employment?

## STATEMENT OF THE CASE

## I. Factual Background

### A. Structure of the Department of Veterans Affairs

#### 1. The Veterans Health Administration (VHA)

The Veterans Health Administration (the "VHA") is the largest of the three administrations of the United States Department of Veterans Affairs. VA Manual at 2 ("VA Manual"). [1] The four statutory missions of VHA are: 1) to develop, maintain, and operate a national health care delivery system for eligible Veterans; 2) to administer a program of education and training for health care personnel; 3) to conduct health care research; and 4) provide contingency support for DoD and Department of Health and Human Services (HHS) during times of war or national emergency. (VA Manual, p. 128). The VHA provides care to more than 7 million veterans annually. *See* 2019 GAO Report, p. 2 ("GAO Report"). [2]

---

[1] https://www.va.gov/ofcadmin/docs/VA_Functional_Organization_Manual_Version_3-1.pdf (Last visited October 27, 2022).

[2] The 2019 GAO Report can be found at https://www.gao.gov/assets/gao-19-462.pdf (Last visited October 27, 2022).

The VHA operates one of the nation's largest health care systems, with 18 regional Veterans Integrated Service Networks (VISN) that manage and oversee 172 medical centers and other medical facilities. GAO Report at 2. The VHA's health care delivery system is organized regionally, around VISNs. The VISNs were established in 1995 as a part of a strategy to decentralize VA health care decisions and bring decision-making closer to the point of care. *Id.* at 5. Each of the VISN's has a director who reports to the VHA's Deputy Under Secretary for Operations and Management. *Id.* VISNs manage regional markets that deliver health care, social services, and support services to veterans. Each VISN is responsible for overseeing medical centers within a defined geographic area. VISNs manage the day-to-day functions of medical centers within their networks through efforts such as periodic strategic, business, and financial planning meetings. *Id.*

## 2. VA Northwest Health Network (VISN 20)

VISN 20, the VA Northwest Health Network, includes the VHA's facilities in the states of Alaska, Washington, Oregon, most of the state of Idaho, and one county in Montana and California. 2-ER-138.

### 3. The VA Portland Health Care System (VHAPOR)

The VA Portland Health Care System (VHAPOR) serves more than 95,000 unique Veterans and handles approximately 950,000 outpatient Veteran visits each year in Oregon and Southwest Washington. VHAPOR consists of the main tertiary care medical center overlooking the city of Portland, the Vancouver Campus in Vancouver, Washington, and ten outpatient clinics across Central and Northwest Oregon. VHAPOR is connected to Oregon Health & Science University (OHSU) both physically and through academic partnerships with shared research endeavors, the training of healthcare professionals, and the use of shared staff.[3]

At all times relevant to these proceedings, Darwin Goodspeed served as the director at VHAPOR. 3-ER-401. The VHAPOR chief of staff reports to the director and is responsible for overseeing the clinical operations at the facility. *Id.* Dr. Thomas Anderson served as the chief of staff at VHAPOR from March of 2010 until he retired in June of 2014. 2-ER-368. Upon Dr. Anderson's retirement, Dr. David Coultas became VHAPOR's chief of staff and remained in that position until

---

[3] https://www.portland.va.gov/about/index.asp (Last visited May 27, 2021).

14

July of 2016. 2-ER-141, 142. Dr. Sahana Misra became the acting chief

of staff in September of 2016. 2-ER-234, 235. In addition to a chief of

staff, VHAPOR has a deputy chief of staff position. 2-ER-140. Dr.

MaryAnn Curl served in that position from 2012 until August 1, 2019.

2-ER-140.

One of the five divisions of clinical care at VHAPOR is the

Operative Care Division (OCD). The OCD has four separate directors

with management responsibilities: (1) chief of surgery; (2) chief of

anesthesia; (3) director of nursing; and (4) administrative director. 2-

ER-219.

Dr. McLafferty began working at VHAPOR as its chief of surgery

on May 6, 2013. 5-ER-879. Additionally, he served as the co-clinical

director of the OCD. 2-ER-143. In this capacity, amongst other

responsibilities, he had oversight responsibility for fifteen different

surgical services. 2-ER-317. In total there were approximately 50 full-

time surgeons employed at VHAPOR and around 120 other contractual

surgeons who were fully credentialed at VHAPOR. 2-ER-316. As chief of

surgery, Dr. McLafferty reported to VHAPOR's chief of staff. 2-ER-319.

In early 2014, Dr. Michael Wheatley served as the section chief for the Plastic Surgery Service. 2-ER-145. In that capacity he reported directly to Dr. McLafferty. *Id.*

**B.  Dr. Michael Wheatley is temporarily removed from his position and has his medical privileges summarily suspended.**

On March 11, 2014, Dr. Michael Wheatley was questioned by officials from the Office of Inspector General (the "OIG"). 3-ER-549. During that questioning they asked him about his usage of prescription medications. 3-ER-549. Apparently, Dr. Wheatley's wife, another physician at VHAPOR, Dr. Jaroslava Zoubek, had been writing him prescriptions for OxyContin over a long period of time. 5-ER-881, 4-ER-610. The OIG determined that she was writing these prescriptions to him for about 200 to 400 pills per week. 5-ER-881, 2-ER-350.

On March 12, 2014, then VHAPOR Interim Director Michael Fisher wrote a letter to Dr. Wheatley suspending his privileges to practice at VHAPOR.  In the letter Mr. Fisher wrote:

> This is to notify you that your privileges are summarily suspended effective this date.  This action is being taken upon the recommendation of the Chief of Staff because failure to take such action could result in an imminent danger to patients.  Concerns have been raised regarding the safety of your clinical practice.

> This suspension is in effect pending a comprehensive
> review of these allegations. 4-ER-835.

The letter made it clear that Dr. Wheatley was to be paid while he was summarily suspended. *Id*.

The then chief of staff, Dr. Thomas Anderson, explained why the decision was made to summarily suspend Dr. Wheatley:[4]

> The recommendation by the Chief of Staff and the
> decision by the Acting Medical Center Director to
> summarily suspend privileges was based on
> information provided to the Acting Medical
> Center Director and the Regional VA OIG Lead
> Agent. This decision was fully vetted with and
> supported by VA legal counsel.[5] Neither Dr.
> McLafferty nor Curl had decisional authority over
> this action.[6] Dr. McLafferty provided information,
> all favorable, regarding the surgeon's clinical
> practice, and as a supervisor delivered the
> summary suspension letter from the acting

---

[4] The summary suspension procedure is specifically provided for in the VHA Handbook, 1100.19, Credentialing and Privileging at 51. https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=2910 (Last visited October 27, 2022).

[5] Contemporaneous emails from the time show that legal counsel, Leigh Schwarz, was involved in this process and approved of summarily suspending Dr. Wheatley. 5-ER-926-932. Further, Ms. Schwarz wrote a letter to Dr. Wheatley's attorney on March 14, 2014, explaining why the summary suspension was put into effect and explained that there were "serious patient safety concerns . ." 4-ER-819.

[6] Dr. McLafferty confirmed that he did not make the decision to summarily suspend Dr. Wheatley. 2-ER-352-52.

> Director to the surgeon and also notified him of restoration of privileges. 5-ER-923; *see also* 5-ER-1016.[7]

Dr. McLafferty had no idea that there was any investigation of Dr. Wheatley until the OIG's office arrived on March 11, 2014. 5-ER-881. Dr. McLafferty's role, as Dr. Wheatley's supervisor was limited to simply delivering Mr. Fisher's letter. 5-ER-883.

Roberta Ruimy, the administrative director of the OCD, explained:

> The Chief of Staff at the time made the decision to put Dr. Wheatley on summary suspension until more information could be obtained. He did this to assure that Veteran safety was put first. There was discussion with legal counsel for the VA, and it was recommended Dr. Wheatley not be drug tested. 4-ER-610.

It turned out that Dr. Zoubek, while she was writing the prescriptions in Dr. Wheatley's name, would pick up the prescriptions and use the drugs herself. She was the one who had a drug issue and not Dr. Wheatley. 3-ER-376, 5-ER-882. When this became clear it was

---

[7] An ongoing theme – one that was even brought up by Dr. Misra during the grievance hearing – was the fact that Dr. Wheatley was not asked to take a drug test at the time. Dr. McLafferty had nothing to do with any of these discussions at the time that they occurred. It was legal counsel who told Dr. Anderson that they could not ask Dr. Wheatley to take a drug screen. 5-ER-883, 5-ER-1016, 2-ER-351.

Dr. McLafferty who requested that Dr. Wheatley be immediately returned to work. 4-ER-610, 2-ER-350.

On April 2, 2014, Michael Fisher sent a letter to Dr. Wheatley returning him to work. 5-ER-885.

### C.  Dr. Wheatley files an EEO complaint with the VA

On April 17, 2014, Dr. Wheatley filed a complaint with the VA EEO office alleging that he had been discriminated against because he was perceived to suffer from a disability. 5-ER-878. That complaint focused on his summary suspension and a claim that he was passed over for a pay increase. *Id.*

On May 2, 2014, Dr. McLafferty was notified that Dr. Wheatley had filed an EEO discrimination claim, 3-ER-492, and was only subsequently notified of the specific allegations in late August or early September 2014. 5-ER-879. On September 30, 2014, Dr. McLafferty was interviewed under oath regarding Dr. Wheatley's discrimination claims. 5-ER-877-905.

At some point Dr. Wheatley seems to have amended his complaint to include allegations that he had been retaliated against for filing his complaint. These claims included an allegation that he had been rated

as "fully successful" on his mid-term performance evaluation dated May 6, 2014. 5-ER-879, 3-ER-507.

### D. Dr. Wheatley's ongoing issues handling call coverage for Plastic Surgery.

#### 1. Dr. Edwards' concerns about Dr. Wheatley and his failure to work to get call coverage for Plastic Surgery.

Dr. McLafferty's predecessor in his position was Dr. James Edwards. 2-ER-174. Dr. Edwards served as chief of surgery from June of 2001 through the time Dr. McLafferty arrived. *Id.* In that capacity, like Dr. McLafferty would do subsequently, Dr. Edwards supervised Dr. Michael Wheatley. 2-ER-178.

Dr. Edwards explained that one of the responsibilities that Dr. Wheatley had, as section chief of the Plastic Surgery Service, was ensuring that call was covered. 2-ER-178, 2-ER-124. Dr. Edwards testified that it was critical for VHAPOR to have coverage for all services 24/7. 2-ER-179.

Approximately two years before Dr. McLafferty arrived, Dr. Edwards began having concerns about Dr. Wheatley's handling of the

Plastic Surgery call.[8] Dr. Edwards repeatedly told Dr. Wheatley that he needed to make sure that call was covered for Plastic Surgery. 2-ER-186. Despite this very clear directive, Dr. Wheatley refused to insure that call was properly handled. *Id.* Dr. Edwards also directed Dr. Wheatley to work with OHSU and VA contracting to secure a contract with the OHSU to handle Plastic Surgery call. 2-ER-187. Dr. Wheatley refused to do that. 2-ER-188, 2-ER-149. It got to the point that there was no one on call for plastic surgery on weeknights and weekends. 2-ER-182, 4-ER-686.

Dr. Edwards had multiple conversations in writing and via email with Dr. Wheatley expressing the need to make sure that call was covered and directing him to take care of it. 2-ER-190, 4-ER-681-95. In an email dated February 14, 2013, he wrote "I do not accept that your team is not able to care for OSA patients that are admitted to the Plastics service for monitoring." 4-ER-678; *see also* 2-ER-190. On April

---

[8] Dr. Edwards went into great length about the issues involving Plastic Surgery call, the challenges associated with handling such a call, Dr. Wheatley's refusal to ensure that call was handled properly, the harm associated with not having a plastic surgeon on call, and the steps that he took to try and get Dr. Wheatley to establish a proper call schedule. 2-ER-180-194; *see also* 5-ER-1019-1022.

2, 2013, he wrote a "Clarification of Section Chief Expectations" to Dr. Wheatley expressing concerns about his failure to "develop, implement, and maintain a comprehensive on call schedule" for Plastic Surgery. 5-ER-1050. At times things were so bad that VHAPOR stopped doing inpatient plastic surgeries. 2-ER-189. Shortly before Dr. McLafferty started, Dr. Edwards recommended to Dr. Anderson that Dr. Wheatley be removed as the section chief of Plastic Surgery because of the call issue. 2-ER-194, *see also* 4-ER-688. Dr. Edwards was not the only one who had these concerns about Plastic Surgery call. On May 1, 2013, an administrator, Brian Hammond, wrote an email expressing significant concerns regarding there being no call for plastic surgery and described it as a "large patient safety issue." 4-ER-692. On May 2, 2013, one of the leaders of the Emergency Department wrote that there had been a patient in the emergency room who "needed to be seen urgently by Plastics, however, come to find there is not Plastics cover at night." 4-ER-694; *see also* 2-ER-152-53.

### 2. Call Issues continue when Dr. McLafferty became Chief of Surgery.

During one of his first meetings with Dr. Anderson, Dr. McLafferty was told that there were big problems "with regards to Dr.

Wheatley's ability to manage the call schedule and provide after-hour and weekend call to our veterans." 2-ER-319; 4-ER-609. According to Dr. Curl, when Dr. McLafferty came on board the priority he was assigned by was to "get plastic surgery in line with every other section to take call." 2-ER-149-50. Dr. Edwards expressed the same concerns to Dr. McLafferty. 2-ER-205, 2-ER-321. On July 2, 2013, Dr. McLafferty, following up on Dr. Edwards' clarification letter, sent Dr. Wheatley a letter of expectations regarding call issues. 5-ER-1048.

Roberta Ruimy, VHAPOR's then administrative director of its Operative Care Division, explained that Dr. McLafferty had been asked by the chief of staff to address the concerns regarding Dr. Wheatley's handling of on-call coverage and to prioritize comprehensive on-call coverage in Plastic Surgery. 4-ER-609. She explained that there had been multiple complaints about gaps in call coverage and a negative impact on safe patient care. *Id.*

In April of 2014 Dr. McLafferty had been able to ensure that evening and weekend call would be covered at least 16-19 days per month. 4-ER-638. Then, on October 3, 2014, Dr. McLafferty learned that Dr. Wheatley had dictated that moving forward there would only

be coverage for call during the day on Thursdays. 4-ER-739. This meant

that Dr. Wheatley had completely dropped a day call schedule without

notifying Dr. McLafferty. 5-ER-901. Dr. McLafferty explained that by

cancelling "call schedule with no notification to service leaders, he put

Veterans in clear danger." 4-ER-747. Roberta Ruimy explained:

> Dr. Wheatley unilaterally cancelled the daytime call
> schedule during normal working hours for emergencies
> coming through the Emergency Room and in-patient
> hospital consults, without informing anyone of this
> change. Dr. McLafferty became aware of this only
> incidentally approximately a week later. This had
> clearly put Veterans with hand emergencies at risk of
> harm. 4-ER-610.

Dr. Curl explained that Dr. Wheatley's "inability to provide call

coverage is an unacceptable safety issue in this section and the most

frequent source of dissatisfaction from Emergency Department and

Hospitalist physicians." 3-ER-503. Further, it was clearly insubordinate

as Dr. McLafferty had made it clear to Dr. Wheatley that he was

responsible for insuring "day call schedule." 5-ER-1048.

## E.    Dr. Wheatley's 2014 Service Chief evaluation.

One of Dr. McLafferty's responsibilities in his position was to

recommend credentialing and privileging at VHAPOR for review by the

medical staff committee and the director. 2-ER-352. At VHAPOR all

new physicians need to be credentialed and every physician must be recredentialed every two years. *Id.* That process is multi-layered and one part of it is the service chief evaluation. 2-ER-352-53. The document is used only for credentialing at VHAPOR and not for the purposes of credentialing at any other facility or for use outside of the VHA. 2-ER-354.[9]

On June 19, 2014, Dr. McLafferty signed off on Dr. Wheatley's service chief evaluation. 3-ER-504.[10]  When asked whether he recommended him for credentialing Dr. McLafferty indicated that he did, albeit with some reservations. Dr. McLafferty explained that Dr. Wheatley's patient care was good, however, he had significant issues involving handling a call schedule. 2-ER-354.

In 2015 VHAPOR was contacted by Providence Health Services regarding a credentialing questionnaire for Dr. Wheatley. By that point Dr. Wheatley had filed his official EEOC complaint and Dr. McLafferty

---

[9] This process is thoroughly spelled out in the VHA Handbook, Section 1100.19, Credentialing and Privileging at 47-49 (A PDF version can be found by doing an internet search for "VHA Handbook Section 1100.19").

[10] Dr. Misra's charges erroneously indicate that this document was completed on August 8, 2014. *Compare with* 3-ER-462.

didn't feel comfortable handling the documentation. 2-ER-361. As a result, Dr. Edwards completed that form on March 13, 2015. 5-ER-1019-20, 2-ER-207. Dr. Edwards was very critical of Dr. Wheatley and wrote a detailed handwritten note where he explained the concerns he had with Dr. Wheatley. *Id.*, 2-ER-209.

### F.    Dr. Wheatley's Rating on October 27, 2014.

On October 27, 2014, Dr. McLafferty performed an annual rating of Dr. Wheatley for the time period of October 1, 2013, through September 30, 2014. With two exceptions, Dr. Wheatley was given high marks. He was rated as unacceptable in the categories of "leading change" and "building coalitions." 4-ER-843.[11] Dr. McLafferty detailed the reasons for his ratings. He explained that Dr. Wheatley was not providing a call schedule as required, that Dr. Wheatley had abruptly ended – without discussing it with Dr. McLafferty – day shift call for plastic surgery, and that he had a nurse practitioner doing clinical work while away on vacation. *Id.* Most critically, he wrote:

---

[11] By rule, if any of the important elements used to evaluate are marked as unacceptable then the overall performance rating must be unacceptable. 3-ER-712.

> Recently, Mary Russell could not take day call as the primary responder for day plastic surgery call due to personal issues. Dr. Wheatley informed the call schedule coordinator that there would be no day call schedule for Plastic Surgery. This important fact was not relayed in any way to me from him. Dr. Wheatley had no plan until I approached him. He did not solicit my consultation until I had found this out from the call schedule coordinator. This act of omission means that there was no proactive alerting of the Emergency Department and our Hospitalists and Specialty Care Services, that this put Veterans with emergency plastic surgery problems at risk. 4-ER-725.

Dr. McLafferty explained that "Dr. Wheatley – the Chief of Plastic Surgery – dropped the day call schedule with no notice to me, the emergency room, or the inpatient wards, and put Veterans at serious risk." 4-ER-728. Prior to providing Dr. Wheatley his rating, he spoke with his supervisor, Dr. Curl. 2-ER-343-44. Dr. McLafferty specifically asked her whether he needed to do anything else before he gave Dr. Wheatley the evaluation and she told him he didn't and that he needed to give it to Dr. Wheatley. 2-ER-344.

Dr. Wheatley challenged his rating and it was submitted to Dr. Curl to fully review. 2-ER-157-58. As part of that review process Dr. Curl had a 45-minute meeting with Dr. Wheatley where he was given an opportunity to outline his objections. *Id.* Ultimately, she upheld the

unacceptable rating because of Dr. Wheatley's refusal to handle call issues in Plastic Surgery. 2-ER-159, 3-ER-501-02. Dr. Wheatley acknowledged that as a chief it was his responsibility to ensure that call was properly handled but told Dr. Curl "I am not going to be responsible for call and you can't make me." 2-ER-159. Dr. Curl explained that "I cannot overemphasize the fact that safe and reliable clinical care are the bedrock of our system. The gaps described and unreliable coverage plastics is providing does not meet satisfactory standard." 2-ER-162, 3-ER-502.

## G.   VHAPOR's handling of Dr. Wheatley's EEOC claims.[12]

Dr. Wheatley's charge of discrimination turned into a complaint of discrimination before the EEOC. The complaint, as described by the ALJ, encompassed claims that Dr. Wheatley had been discriminated against because of a perceived disability when he was placed on a summary suspension, that he was denied a pay raise because of the

---

[12] Getting a full sense of the specifics of the EEOC matter is challenging because the critical documents are not a part of the record, despite Dr. McLafferty's attempts to obtain them. In 2016 Dr. McLafferty specifically requested all of the documentation from the EEOC proceedings so that he could respond to the charges. Those documents were never provided to him despite repeated requests. 4-ER-799.

discrimination, that he was subjected to retaliation in the form of harassment regarding his performance and for his failure to handle call in a proper fashion. 4-ER-813. The ALJ framed the issues as "Dr. Wheatley alleges that the agency discriminated against him and subjected him to a hostile work environment based on disability and reprisal beginning on or about March 11, 2014 and ongoing." 4-ER-812.

What happened from there is not entirely clear because the relevant records remain unavailable to Dr. McLafferty. What is clear, however, is that counsel for VHAPOR apparently decided that they did not want to participate in discovery. In an order dated February 18, 2016, the ALJ was explained that VHAPOR had repeatedly failed to provide discovery and ordered sanctions that included:

- All objections by the agency regarding complainant's discovery requests are deemed waived;

- All requests for admission are deemed admitted by the agency;

- The agency shall pay complainant's attorney's fees for all work related to discovery, . . .

- The agency shall not be permitted to rely on any document requested by complainant in his discovery requests at the hearing. Complainant

shall not be limited in the documents upon
which he may rely at the hearing,

- Adverse inferences may follow from the absence
  of evidence during dispositive briefing or the
  hearing.

4-ER-820-21.

Dr. Wheatley then apparently moved for a motion for a decision
without a hearing. 4-ER-812. In granting that motion, the ALJ
explained that the VA "stipulated to all liability except for the issue of
whether he was regarded as being disabled." 4-ER-820, 4-ER-830. The
ALJ found that this one lone issue that was disputed was properly
found in favor of Dr. Wheatley because "it was undisputed" that there
were "lesser measures" that the VA "could have taken" other than a
leave with pay when they were investigating Dr. Wheatley's use of
drugs. 4-ER-829.[13] [14] The ALJ left unsaid whether the issues regarding
his evaluation were retaliatory or engaged in because he was perceived
as disabled. 4-ER-831.

_____

[13] In reaching the conclusions that were reached, the ALJ relied upon
admissions that "were deemed admitted after the agency repeatedly
failed to provide responses." 4-ER-829.

[14] The ALJ suggested that the VA could have "asked [Dr. Wheatley] to
submit to a drug screen." 4-ER-190.

While the decision without a hearing order was issued on February 18, 2016, it seems fairly clear that the findings had been preordained because of the VA's admissions and the fact that they didn't challenge the issue of liability. On December 16, 2015, and January 15, 2015, a hearing was held on the issue of the appropriate damages that should be awarded to Dr. Wheatley. 3-ER-521. On the same day that she ruled on the decision without a hearing motion, the ALJ issued an order as to the issue of damages. 3-ER-545-88. While the precise dollar amount of damages is not outlined, the ALJ found that Dr. Wheatley was entitled to front pay moving forward until Dr. Wheatley reached the age of 65 and compensatory damages of $250,000. 3-ER-584-86.

Owing to the discovery sanctions and the stipulations of liability, the ALJ's determinations were made without the VA presenting evidence to dispute Dr. Wheatley's claims. This meant that Dr. Anderson, Dr. Curl, Roberta Ruimy, and others didn't testify as to why the summary suspension was entered. It meant that no one was able to testify regarding Dr. Wheatley's inability to cover call and the problems that created.

### H. VHAPOR proposes terminating Dr. McLafferty's employment.

On June 2, 2016, the U.S. Office of Special Counsel (OSC) sent a letter to the VA notifying the agency that it had opened an investigation into the EEOC's findings in the *Wheatley* matter. 3-ER-604. The VA was directed to preserve all records related to the matter and was to "consult with us prior to taking any disciplinary action against any of the officials involved in the *Wheatley* matter." *Id.*

On June 7, 2016, VHAPOR's acting director, Todd Burnett, removed Dr. McLafferty from his position as chief of surgery and reassigned him to a position in Vascular Surgery. On July 5, 2016, Mr. Burnett brought charges against Dr. McLafferty seeking to terminate his employment. 4-ER-809-10. The charges at that time related exclusively to Dr. Wheatley's EEOC claims and included allegations that Dr. McLafferty was responsible for the summary suspension, that he failed to ask Dr. Wheatley to submit to a drug screen, that he didn't increase his salary, that he completed a service chief evaluation that impacted his ability to get privileges with other facilities, and that he gave him an unsatisfactory rating on October 27, 2014. 4-ER-809-10.

32

Pursuant to VA rules, on July 13, 2016, Dr. McLafferty requested that he be provided with a complete copy of the VA's records related to EEOC investigation, including the pleadings. 4-ER-799. That request was denied. *Id.*

On August 15, 2016, Dr. McLafferty responded with a lengthy letter and more than 200 pages of documentation to VISN 20 Director Michael Murphy. 4-ER-791-1084. Dr. McLafferty subsequently met with Director Murphy to present an oral response to the charges. 4-ER-791.

On August 31, 2016, the OSC sent a letter to the VA directing that any pending discipline against Dr. McLafferty be rescinded so that it could conduct an investigation. 6-ER-1361. On September 1, 2016, Dr. McLafferty was notified by Mr. Murphy that his proposed discharge had been rescinded by order of the OSC. 6-ER-1362. Thereafter, on November 4, 2016, Dr. McLafferty was issued a memorandum from then VHAPOR director Michael Fisher notifying him that he would be reinstated to his former position as chief of surgery effective November 7, 2016. 6-ER-1370.

## I.   VHAPOR's attempts to secure a call contract for Plastic Surgery.

### 1.   Relationship Between OHSU and VHAPOR

As VHAPOR explains on its website, it has a close relationship with OHSU. Federal law and VA policy strongly encourages VHA facilities to enter into preferred relationships with medical schools. *See* 38 U.S.C. § 7302, 38 U.S.C. § 8153(a)(3)(A); *see also* VA Directive 1663.[15] Indeed, those rules allow for sole source contracting between a preferred academic institution and a VHA facility. *Id.* OHSU is VHAPOR's preferred academic partner. 2-ER-115, 2-ER-195, 2-ER-200, 2-ER-230. Further, nearly ever surgeon and physician at VHAPOR has an OHSU academic appointment and many of them are also employed part-time by OHSU. 2-ER-371.

### 2.   Dr. Anderson and Dr. Edwards attempt to secure call coverage for Plastic Surgery.

As has been explained above, for many years there had not been adequate call coverage for plastic surgery. While he was Chief of

---

[15] This directive is available at https://www.va.gov/vapubs/search_action.cfm?dType=1 (Last visited October 28, 2022).

34

Surgery, Dr. Edwards, working in conjunction with Dr. Wheatley, put out several requests for proposal to the community seeking to ensure that call was fully covered. 2-ER-181. They were not able to have success because there was no one who was willing to take call only to cover VHAPOR while agreeing not to also cover call at other hospitals. *Id.*, 2-ER-203.

Dr. Edwards told Dr. Wheatley that getting call coverage was imperative and that OHSU was their best solution to the ongoing problem. 2-ER-185. Dr. Wheatley, for some reason had disagreements with OHSU, and did not want them to cover the call. *Id.* Dr. Edwards made it clear to Dr. Wheatley that if he didn't want OSHU to cover the call, he needed to find someone else who would but Dr. Wheatley didn't do that either. *Id.* As a result, Dr. Edwards directed Dr. Wheatley to "work with contracting to get a contract with OHSU because that was [the] only remaining alternative." 2-ER-187, 2-ER-203. Dr. Wheatley again refused. 2-ER-188.

Dr. Edwards did not stop at merely directing Dr. Wheatley to work with OHSU. He had multiple discussions with his counterpart at OHSU, Dr. John Hunter, about the issue. 2-ER-196. Dr. Edwards

described his understanding of what role he was allowed to play based

upon what he had been told by the VISN contracting officials:

> . . . what my takeaway from contracting was I couldn't
> have a substantial involvement. And with the people I
> worked with in contracting, they said I could talk about
> what we needed.  I could – I could talk about what our
> preferences were and how we wanted it, but I couldn't
> have any conversations about the finances or the
> details of the contract or anything like that. But in
> terms of requirements and whether the requirements
> were being met, I could talk about that.
>
> So, yeah, I could tell Dr. Hunter that we needed call
> coverage and, you know, I could talk to the chief of
> plastics that we needed call coverage, and I could talk
> about the models that we had with other divisions, but
> I couldn't talk about, you know, we will pay so much an
> hour, and I couldn't' talk about whether the contract
> was going to be a fixed price or, you know, per night . . .
> 2-ER-198-201, *see also* 2-ER-227.

### 3.    Dr. McLafferty is directed to continue Dr. Edwards' work of getting OHSU to handle call coverage for Plastic Surgery.

When Dr. McLafferty took over the chief of surgery role, Dr.

Edwards told him that securing a call contract with OHSU for plastic

surgery was his best option. 2-ER-205. Dr. Anderson directed Dr.

McLafferty to move forward to work towards a call contract with OHSU

for Plastic Surgery in 2013. 3-ER-487-88.[16] Dr. McLafferty then reached

out to the OHSU Plastic Surgery Chief, Dr. Juliana Hansen, and told

her that Dr. Anderson wanted to move forward with a call contract with

OHSU. *Id.* Dr. Hansen was apprehensive because of all of the problems

Dr. Wheatley had caused. She remarked that Dr. Wheatley "doesn't

even take call on patients he has operated on – he punts those calls to

us." *Id.* Notwithstanding OHSU's reticence, the VISN contractual

representatives began putting together a contract with OHSU for call

coverage for Plastic Surgery. 3-ER-489, 2-ER-34, 4-ER-637, 4-ER-640-

42. Ultimately, no contract for call was obtained during Dr.

McLafferty's first year in the job. 6-ER-1133.[17]

The concerns regarding no call coverage for Plastic Surgery did

not dissipate. OHSU was apprehensive about entering into an

---

[16] In Dr. McLafferty's performance expectations for October 1, 2013 –
September 30, 2014, he was specifically directed to work towards
"[p]artnerships and development of two new contracts with
Neurosurgery and Plastic Surgery at OHSU for call coverage." 6-ER-
1133.

[17] Dr. Coultas justified Dr. McLafferty's "outstanding" performance
rating in late 2015, in part, because he had worked so hard at obtaining
call coverage from OHSU for Cardiac Surgery. 6-ER-1137.

agreement and Michael Morrison, a VISN contract specialist, wrote on

March 2, 2015:

> We've followed up with OHSU dozens of times on the
> subject procurements, to no avail. Continued follow-
> ups from Contracting are having no effect. I think
> higher level discussions need to take place to
> determine if any of these three will move forward. As
> long as there is no negotiation of terms & conditions or
> pricing, I'm okay with OCD reaching out to OHSU
> leadership to find out generally if these actions will
> continue, and if so, when the VA should expect a
> response. 4-ER-643-44.[18]

Dr. McLafferty and Roberta Ruimy both responded to this request from

contracting advising that they would follow up with OHSU. 4-ER-643.

In 2016 Dr. McKeown, the Interim Chief of Emergency Medicine

at VHAPOR, wrote that continued problems owing to there being no call

coverage for Plastic Surgery and issued a plea for call coverage. 4-ER-

650. Shortly thereafter, Dr. Coultas' office sent out an email stating

that the "inability to provide continuity of care, and on-call coverage

---

[18] Throughout his communications with OHSU, Dr. McLafferty made it
clear that he could not talk about terms, conditions, and pricing with
OHSU. 2-ER-370. In an email to Dr. Hansen, he made that clear by
explaining "[w]e cannot speak about dollars, but we can
speak about details of how we would shape a clinical service that makes
OHSU a significant partner." 4-ER-649.

gaps during regular and after hour times for patients undergoing plastic and surgery in the [VHAPOR], Veteran safety is at serious risk moving forward." On April 6, 2016, the VISN office wrote "[i]s there not a contract yet with OSHU." 4-ER-646. Dr. Coultas responded to this inquiry by stating that there was not a contract with OHSU to cover the call but "going forward that is the long-term plan." 4-ER-646.

Throughout his efforts to discuss Plastic Surgery call coverage with OHSU McLafferty continually kept his supervisors abreast of his discussions. 2-ER-364-65. Indeed, Dr. Anderson, Dr. Curl, Dr. Coultas, and Dr. Misra all told him that he needed to pursue the relationship with OHSU. *Id.*[19]

## J.    Dr. McLafferty's job performance at VHAPOR.

Throughout his tenure with VHAPOR, Dr. McLafferty's job evaluations were always exceptional. On March 24, 2015, Dr. Coultas evaluated Dr. McLafferty as exceptional in every category. 6-ER-1135-

---

[19] Dr. McLafferty's annual performance evaluations demonstrate this. Throughout there are references about his need to secure call coverage with OHSU and consistently outstanding marks about his ability to work with OHSU in developing contracts. 6-ER-1133, 6-ER-1137, 6-ER-1155, 6-ER-1163, 6-ER-1202, 6-ER-1204, 6-ER-1211-12, 6-ER-1218, 6-ER-1244, 6-ER-1258, 6-ER-1261.

37. Dr. Coultas specifically referenced Dr. McLafferty's efforts when it came to "building coalitions" because of his efforts at obtaining coverage from OHSU. 6-ER-1137. On October 21, 2015, Dr. Coultas evaluated his annual performance as "outstanding," the highest possible category. 6-ER-1138.

In 2016 Dr. McLafferty was again given an exceptional rating in every category with Dr. Misra specifically highlighting his improving the relationship with OHSU. 6-ER-1180. For his annual evaluation for the period ending on September 30, 2016, Dr. McLafferty received an overall rating of "outstanding." 6-ER-1181.

In 2017 Dr. Misra again gave Dr. McLafferty an exceptional in every category. 6-ER-1198. She specifically referenced his efforts in working with "OHSU partners." 6-ER-1198. For his annual evaluation for the period ending on September 30, 2017, Dr. Misra again rated Dr. McLafferty in the highest possible category – "outstanding." 6-ER-1199.

Like he had been every year before, Dr. McLafferty was again ranked as exceptional in every category in 2018. 6-ER-1244. In the category of "building coalitions" Dr. Misra specifically referenced his efforts when it came to working with OHSU regarding Plastic Surgery.

6-ER-1244. For his annual evaluation for the period ending on October

1, 2018, Dr. Misra again rated Dr. McLafferty as "outstanding." 6-ER-

1245.

## II.    Procedural Background

### A.    Dr. Misra recommends Dr. McLafferty's termination.

On July 12, 2019, Dr. Misra issued a memorandum to Dr.

McLafferty advising him that she was proposing that he be discharged

3-ER-462. Dr. Misra outlined two different charges against Dr.

McLafferty:

> **CHARGE 1:    Inappropriate Conduct (Conflict of Interest)**
>
> From approximately November 2013 to October 2014, you held an appointment with OHSU; at the same time, you were engaged in discussions with OHSU and were making recommendations to VA regarding entering a surgery call contract with OHSU. Your actions were in violation of VHA Handbook 1660.03 and 5 C.F.R § 2635.402.
>
> **CHARGE 2:    Inappropriate Conduct (Prohibited Personnel Practice)**
>
> **SPECIFICATION 1:** On August 8, 2014, you completed a "Service Chief Evaluation" of Dr. Wheatley related to his obtaining privileges at other medical centers. In this evaluation you recommended him, "With Reservation," stating "While Dr. Wheatley has shown good patient care, he has been difficult to work

with regards to OHSU partnership, proactive communications and managing his service after regular hours." You made the negative comment about Dr. Wheatley based on Dr. Wheatley's opposition to the potential OHSU contract, and/or Dr. Wheatley's protected EEO activity. This is a prohibited personnel practice under 5 USC § 2302(b)(1), (8), and/or (9).

**SPECIFICATION 2:** On October 27, 2014, you rated Dr. Michael Wheatley "Unacceptable" on his Executive Career Field performance appraisal, despite the rating of 'Fully Successful or better' on his mid-year progress review on May 6, 2014. In the review you stated, "While Dr. Wheatley has worked to find Plastic Surgeons outside of OHSU to use as fee providers . . . I have requested that he continue to work with Dr. Juliana Hansen, the Chief of Plastic Surgery at OHSU, in creating opportunities for a contractual agreement with the University so as to have them assist in covering after hours call. He has shown no effort in this regard with regards to communication, meetings, or coordination of this request to partner with University." You made the negative comment about Dr. Wheatley based on Dr. Wheatley's opposition to the potential OHSU contract, and/or Dr. Wheatley's protected EEO activity. This is a prohibited personnel practice under 5 USC § 2302(b)(1), (8), and/or (9).

3-ER-462-63.

Dr. Misra further advised Dr. McLafferty that, in accordance with 38 U.S.C. § 7462, he had seven business days in which to respond to the proposed notice of removal. 3-ER-463. Dr. McLafferty was provided with a copy of the purported "evidence on which this notice of proposed

action is based." 3-ER-463. Dr. Misra outlined eight different reasons

which warranted termination. These included:

* * * * *

    d.    The facts underlying these charges were the
subject of an EEO case by Dr. Wheatley against
the VA that resulted in a finding that you
illegally discriminated against Dr. Wheatley, and
a judgment against VA in excess of $4,000,000.

    e.    This proposal was delayed at the request of the
Office of Special Counsel, which requested that
the original proposed disciplinary action against
you be rescinded to allow OSC an opportunity to
investigate the matter.

    f.    The facts underlying these charges were the
subject of an investigation by the Office of Special
Counsel, which determined that your actions
were prohibited personnel practices, in violation
of 5 USC § 2302(b)(1), (8), and/or (9).

3-ER-464.

Shortly after Dr. McLafferty was removed from his position, Dr.

Misra met with fifteen to twenty members of VHAPOR's operative care

division. 2-ER-129. During that meeting she advised them that Dr.

McLafferty had been removed and stated that an external review had

been completed and "their recommendation had come back that Dr.

McLafferty be removed from his position, and that she could either

43

carry that out and if she didn't that other means would be taken to accomplish that." 2-Er-129-30.[20]

## B. Dr. McLafferty filed a timely response to Dr. Misra's charges.

On July 19, 2019, Dr. McLafferty responded to Dr. Misra's proposed discharge. 4-ER-610-780. This response was supplemented on July 23, 2019. 4-ER-781-790, 4-ER-791-5-ER-1082.

## C. Director Goodspeed terminates Dr. McLafferty's employment.

On August 2, 2019, Director Goodspeed notified Dr. McLafferty with a letter advising that he was being removed from federal employment, effective August 16, 2019. 5-ER-1083-85. The letter indicated that it was taking into consideration the "aggravating factors" cited by Dr. Misra. 5-ER-1083.

---

[20] Dr. Misra largely confirmed this. She advised that she had been told by Ken Piumarta that the OSC was demanding that Dr. McLafferty be removed. 2-ER-250-51. She further explained that "there was an understanding, a shared understanding between [VA Office of General Counsel] and [HR] that the OSC had wanted – wanted termination." 2-ER-255. Dr. Misra worked closely with Mr. Piumarta in drafting the charges that were leveled against Dr. McLafferty, 2-ER-256.

Director Goodspeed's letter advised Dr. McLafferty that he had

had three options if he wanted to challenge the decision: (1) a request

for corrective action to the OSC; (2) a grievance under VA procedure; or

(3) a discrimination complaint filed with the EEOC. 5-ER-1085.

Attached to the letter was a copy of VA Handbook 5021, Part IV,

Chapter 3. 5-ER-1086-1099.

On August 12, 2019, Dr. McLafferty contacted Ken Piumarta, the

Chief of Employee Relations at the VHAPOR, requesting that a formal

grievance and hearing be provided. 6-ER-1329-30. Mr. Piumarta

responded by advising Dr. McLafferty that the procedure was laid out

in VA Handbook 5021, Part IV, Chapter 3 and that his grievance was

due on August 19, 2019. 6-ER-1329.

## D. Dr. McLafferty Files a formal grievance pursuant to VA policy.

On August 16, 2019, Dr. McLafferty filed a formal grievance under

the Grievance Policy. His grievance read:

> 1. Dr. McLafferty's procedural rights were
> violated. Under federal law, before an
> employee can be removed from service, that
> employee is entitled to receive "advance
> notice of the action and a file containing all
> evidence in support of the proposed action."
> 38 U.S.C. 713(b)(1)(A). While Dr.

McLafferty was provided with a limited evidentiary file, he was not provided with a copy of all evidence in support of the proposed action. Ultimately the VA has simply relied upon the findings of the OSC in justifying the decision we are now grieving. The OSC did a lengthy investigation in which it received mountains of documents and other evidentiary materials. We know that we have not received all of the paperwork because a good portion of the materials that we provided are not included in the evidentiary file Dr. McLafferty was provided. The omission of critical information rendered it impossible for Dr. McLafferty to fully challenge the charges against him. By not providing him with the evidence that the OSC relied upon Dr. McLafferty had no means to challenge the underlying conclusions that were reached.

2. Dr. McLafferty did not engage in inappropriate conduct. There is not substantial evidence to support the conclusion that Dr. McLafferty engaged in inappropriate conduct. When Dr. McLafferty was afforded the opportunity to respond to your proposed discharge we provided a fairly lengthy written response – that included many exhibit – to the allegations against him outlining how we believed that he had not violated VA policies. Rather than regurgitating all of that information here, we simply reincorporate those arguments and ask that all of those materials be incorporated into the grievance file. Should you find it

> necessary that we provide a copy of all of
> those arguments we are happy to do so.
>
> 3. Removal from federal service was arbitrary
>    and capricious. The charges Director
>    Goodspeed found that Dr. McLafferty
>    violated do not justify termination of his
>    employment. The decision is thus arbitrary
>    and capricious.

5-ER-1101-02.

On August 27, 2019, Andrea Smith, Deputy HR Officer, sent an email to Dr. McLafferty indicating that Michael Murphy had received the grievance. 5-ER-1104. Ms. Smith indicated that they needed to have the grievance amended to include the type of relief Dr. McLafferty was requesting. *Id.* On August 28, 2019, Dr. McLafferty outlined his requested relief which included reinstatement. 5-ER-1106.

**E.   Procedures leading up to the grievance hearing.**

On September 16, 2019, after not having heard from anyone regarding his grievance, Dr. McLafferty wrote to Andrea Smith asking if she needed any additional information related to his grievance. 6-ER-1348. Ms. Smith tersely responded by stating "[w]e'll let you know." *Id.*

On September 26, 2019, approximately six weeks after Dr. McLafferty had filed his grievance, Ms. Smith notified Dr. McLafferty

that his grievance had been assigned to Jacqueline Ross. 6-ER-1349.

Dr. McLafferty immediately contacted Ms. Ross requesting dates for the

grievance hearing. 6-ER-1350. Ms. Ross asked about what kind of a

hearing Dr. McLafferty was seeking and he responded that he would

prefer an in-person hearing and to have the opportunity to present

witnesses and documents. 6-ER-1355. Dr. McLafferty explained that he

understood under the Grievance Policy that the timeframes were very

narrow. 6-ER-1355. Ms. Ross responded that she would get back to Dr.

McLafferty the following week. *Id.*

On October 4, 2019, Ms. Ross sent an email apologizing that she

had not reached out. She explained that:

> I understand that both you and your client would like
> the grievance process to move along as expeditiously as
> possible. So, I apologize that, at this time, I am not able
> to make final hearing arrangements.

6-ER-1357. She advised she would get back in touch the week of

October 14. *Id.*

On October 16, 2019, Ms. Ross wrote to Dr. McLafferty explaining

that "an extension to the 45 days grievance timeline has been granted

in accordance with [the Grievance Policy], paragraph 5.c and that her

the "new completion deadline" was December 6, 2019. 6-ER-1360. Ms.

Ross explained that the "[t]he extension was granted to assign a VA Management Representative for the hearing and because of a previous leave commitment of mine." *Id.* On December 16, 2019, an evidentiary hearing was held before Ms. Jacqueline Ross. A verbatim transcript of the hearing was prepared. 2-ER-83-3-ER-461.

## F.    Post-hearing issues and delays.

As directed by the Grievance Examiner, the parties submitted written closing arguments simultaneously on January 14, 2020. On February 9, 2020, Dr. McLafferty wrote to Ms. Ross inquiring as to the status of her report and expressed concern that he had not received a copy. 6-ER-1321. On February 10, 2020, Ms. Ross responded to Dr. McLafferty's email by stating that "[m]y report is finished and once the VISN Director makes a final decision, his office will contact you." 6-ER-1322. That same day Dr. McLafferty responded to Ms. Ross and expressed concern that a copy of her report had not been submitted to him when it was submitted to Director Murphy. 6-ER-1276. In that email Dr. McLafferty explained that paragraph 12(e) of the Grievance Policy provided that when the examiner's recommendations are submitted to the "decision official" that the "examiner will also furnish

a copy of the report to the employee and to the employee's representative." 6-ER-1276.

On February 12, 2020, Ms. Ross sent an email to Dr. McLafferty indicating that at some point he would receive her final report and the "complete evidence file" but she could not provide an exact date for that 6-ER-1323. On February 19, 2020, Ms. Ross wrote to advise that she had spoken with Director Murphy's office and still did not have a date when Dr. McLafferty would be advised of the outcome of the grievance. 6-ER-1324.

On February 19, 2020, Dr. McLafferty wrote to Ms. Ross again and continued to express concern that a copy of her report had not been provided to him. 6-ER-1324. In that email he explained:

> . . . for the reasons that I previously addressed, I do believe that we are entitled to a copy of your recommendation at the time it was submitted to Mr. Murphy.

*Id.* Dr. McLafferty requested that a copy of that email be sent to the VISN office. *Id.* Ms. Ross confirmed that she sent a copy of Dr. McLafferty's February 19, 2020, email to Director Murphy's office on February 20, 2020. 6-ER-1325.

On March 1, 2020, Dr. McLafferty sent a letter and a set of exhibits to Director Murphy. 6-ER-1293-1328. In that letter Dr. McLafferty outlined the procedural irregularities of the process and how the VA's handling violated federal law. 6-ER-1326-29. The exhibits that Dr. McLafferty provided documented those concerns. 6-ER-1294-1325.

### G. Michael Murphy upholds Dr. McLafferty's termination on March 6, 2020.

On March 6, 2020, Dr. McLafferty received an email that attached a copy of Michael Murphy's final decision sustaining the discharge and also attached a copy of Ms. Ross's report and recommendation. 1-ER-67-69.[21] While he offered no justification for why he was upholding the discharge, he expressly rejected Dr. McLafferty's contentions that his procedural rights had been violated. *Id.*

---

[21] Ms. Ross apparently submitted her recommendation to Director Murphy six weeks before it was sent to Dr. McLafferty on January 24, 2020. 1-ER-70-76.

## SUMMARY OF THE ARGUMENT

Dr. McLafferty advances three primary arguments as to why the VA's decision to terminate his employment must be reversed.

First, 28 U.S.C. § 713 mandates that there be procedures in effect for the termination of employees like Dr. McLafferty. The statute makes it clear that an employee must be provided with "a file containing all evidence in support of the proposed action." *Id.* The push to terminate Dr. McLafferty came from the OSC and was premised upon the EEOC's conclusions regarding the Wheatley matter. VHAPOR's decision makers clearly premised their decisions on those ancillary proceedings. Both the OSC and the EEOC collected reams of evidence and none of that was ever provided to Dr. McLafferty. As a result the evidence that was utilized to justify his termination was never provided to him and this violated his rights.

The statute also requires the VA to have a grievance procedure. While it is not explicitly stated in the statute, one can logically assume that the VA is also obligated to comply with its procedure. VHPAOR has a procedure, however, they completely ignored it throughout the grievance process.

Second, the VA could only terminate Dr. McLafferty if it was convinced by a preponderance of the evidence that he had engaged in malfeasance or misconduct. Based upon the record no such conclusion can be justified. Dr. McLafferty did not retaliate against Dr. Wheatley and he did not engage in a conflict of interest. Interestingly it seems as though the conflict of interest claim was thrown in late in the proceedings once the OSC had completely scoured Dr. McLafferty's entire background. Again, none of their work has been allowed to be scrutinized.

Finally, as it relates to his interactions with OHSU and Dr. Wheatley, Dr. McLafferty was merely doing what he had been directed to do. His performance evaluations and the testimony at the hearing made it clear that he had been directed over and over to work with OHSU to secure a call contract for Plastic Surgery. Likewise, the actions involving Dr. Wheatley were only done with the wholehearted agreement of his supervisors. When an employee is simply carrying out the legitimate directives of his supervisor termination cannot be an appropriate disciplinary action.

## STANDARD OF REVIEW

In the not-too-distant past, employees like Dr. McLafferty could challenge their termination through the Merit System Protection Board. In 2014, however, Congress became concerned about problems that had occurred at some VHA facilities and addressed the challenges associated with terminating senior executives. To address the concern Congress enacted § 707 of the Veterans Access, Choice, and Accountability Act, which outlined new rules for the removal or transfer of VA Senior Executive Service employees. Pub. L. No. 113-146.

The new law provided little opportunity for VA Senior Executives to challenge their ouster. Ultimately, in *Helman v. Dep't of Veterans Affairs*, 856 F.3d 920, 923 (Fed. Cir. 2017), the Court found these provisions to be unconstitutional. After *Helman* Congress revised Section 713 which now specifically allows Senior Executives to obtain "judicial review" of a decision to terminate their employment. 38 U.S.C. § 713(b)(5). The law outlines the appropriate standards for this Court to utilize on review:

> (6) In any case in which judicial review is sought under paragraph (5), the court shall review the record and may set aside any Department action found to be –

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law;

(B) obtained without procedures required by a provision of law having been followed; or

(C) unsupported by substantial evidence.

38 U.S.C. § 713(B)(6).

This standard of review is nearly identical to the standard used by the Federal Circuit in reviewing appeals from the Merit Systems Protection Board. 5 U.S.C. § 7703(c).

While the arbitrary and capricious standard is deferential, is no intended to be a rubber stamp of an agency decision. As the Supreme Court has explained, a court cannot slip into "judicial inertia" when reviewing agency decisions simply because deference is owed to an agency. *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97, 104 S.Ct. 439, 444 (1983).

This Court must also review whether the VA's determination is supported by substantial evidence. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938). While it is less than a preponderance of

the evidence, substantial evidence is "more than a scintilla" that would "create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501 (1939).

Finally, in determining whether the disciplinary sanction is appropriate the abuse of discretion standard applies. *McClaskey v. United States Dep't of Energy*, 720 F.2d 583, 586 (9th Cir. 1983).

This Court is reviewing the agency determination and gives no deference to the district court's holding. *Dubnow v. McDonough*, 30 F.4th 603, 609 (7th Cir. 2022).

# ARGUMENT

**I.  Throughout these proceedings the VA completely ignored Dr. McLafferty's procedural rights and its own statutorily mandated rules.**

The statute provides that this Court may set aside any decision by the VA that was "obtained without procedures required by a provision of law having been followed." 38 U.S.C. § 713(b)(6)(B).[22] That same provision provides that Dr. McLafferty was entitled to receive all evidence that was relied upon in making the decision and that he would be entitled to grieve any adverse action pursuant to the procedures established by the VA. 38 U.S.C. § 713(b).

In this case the VA abdicated its responsibility to make a decision to two other entities. It relied seemingly exclusively upon the EEOC and the OSC. Given that Dr. McLafferty was not provided with the vast amount of documentation those two agencies relied upon in reaching their conclusions, he has been afforded no meaningful opportunity to challenge those findings.

---

[22] Despite the fact that Dr. McLafferty thoroughly outlined this procedural argument the district court did not address it.

**A.  Dr. McLafferty was not provided with a complete copy of all evidence that provided the justification to terminate his employment.**

Federal law is clear that before Dr. McLafferty could be removed from service he was entitled to "advance notice of the action and a file containing all evidence in support of the proposed action." 38 U.S.C. 713(b)(1)(A). In two meaningful respects this never occurred. The VA is in whole relying upon two conclusions reached by the OSC and the EEOC. There are voluminous records that both of those entities received while engaging in their respective proceedings. Despite repeated requests, that information largely has not been provided to Dr. McLafferty. 4-ER-799.

Based upon the testimony that was offered at the grievance hearing it is clear that the OSC dictated that Dr. McLafferty's employment to be terminated. 2-ER-129-30. Mr. Goodspeed explained that the OSC had conducted a years' long investigation where numerous people were interviewed. 3-ER-409. Director Goodspeed testified that he believed that their investigation was "very thorough" and he explained what he had been told once the investigation was completed. 3-ER-413. He explained that he had been told by legal

counsel that the OSC had conducted its investigation and wanted Dr. McLafferty terminated. 3-ER-414. Dr. Misra testified that she was told the same thing. 2-ER-250-52.

Prior to the hearing Dr. McLafferty hadn't been told that the OSC was pushing for his termination. Even if the OSC had the authority to make such a demand, the problem becomes that they only provided a pittance of the investigation that they completed. Based upon the affidavits of Mr. Piumarta and Ms. Miller, *see* 5-ER-1107-10, we know that the VA requested the entire investigatory file but the OSC refused to provide it. We also know that there had to be significant amounts of documentation included as part of that investigation. Dr. Curl alone testified that she had been interviewed no fewer than eight times by the OSC for "hours upon hours" 2-ER-167. She explained that she "had to give everything that I had. They pulled everything out of my computer." 2-ER-166. The same, of course, was true for Dr. McLafferty and, undoubtedly, countless others.[23]

---

[23] The OSC wrote a detailed letter to the VA outlining all of the information that it was requesting as part of its investigation. 6-ER-1363-67. It is clear that huge amounts of information were provided to the OSC and Dr. McLafferty was provided with only a pittance of that information.

Despite this "thorough" investigation, the evidence file that was originally produced by the OSC to the VA contained only about 66 pages of information. 5-ER-1108. Those 66 pages include scant evidence supporting the claims against Dr. McLafferty.

The testimony of both Dr. Misra and Director Goodspeed make it clear that they were swayed by the purportedly thorough investigation that was done by the OSC. Dr. Misra – and by reference Director Goodspeed – both cite to the OSC investigation as being an aggravating factor in their respective decisions. The problem presented is that Dr. McLafferty is forced to challenge the findings of the OSC without having any access to its investigation or even knowing what documentation it developed or relied upon.

The VA also relies almost entirely upon the decision of the EEOC ALJ. Like the OSC investigatory file, the EEOC file has not been presented to Dr. McLafferty. In this case, the VA is essentially bootstrapping the decision of the ALJ into its justifications to support the discharge. While such an attempt is, as demonstrated above, procedurally flawed, and insufficient to establish the charges, the flaws become magnified because Dr. McLafferty has not been afforded the

opportunity to review all of the documents that the ALJ reviewed when making her determination. In an email dated July 13, 2016, that was sent to Todd Burnett, Tracye Davis, and Andrea Smith, Dr. McLafferty requested a complete copy of the documents submitted to the ALJ. That request was denied. 4-ER-799.

The EEOC determinations were not made in a vacuum. They were based upon admissions advanced by the VA and because of its failures to comply with its discovery obligations. As the opinions from the ALJ make clear, there are a multitude of different documents that became part of the EEOC proceeding. At a minimum this would have included:

> Dr. Wheatley's actual complaint, the VA's response, the VA's acceptance letter dated August 15, 2014; the VA's acceptance letter dated February 12, 2015; the discovery requests that were exchanged; the discovery responses that were provided; Dr. Wheatley's motion for a summary decision; the VA's response to the motion for a summary decision; the internal VA EEO investigation; the damages documentation, and many others.

The VA relied upon the EEOC determination in terminating Dr. McLafferty. We know this is true because they included it in their evidence file and because Dr. Misra lists this as an aggravating factor that supports discharge. By failing – despite repeated requests – to

61

provide this information the EEOC has not provided McLafferty with all of the evidence that has been used to make the termination decision.

What has happened is that: (1) Dr. Wheatley made a complaint; (2) for reasons that have never been explained the VA chose not to challenge portions of his complaint; (3) the VA refused to comply with its obligations to produce discovery and was sanctioned; (4) Dr. McLafferty nor other witnesses were allowed to testify as to the justifications for the actions taken related to Dr. Wheatley; (5) a summary disposition is entered against the VA and not against Dr. McLafferty; and (6) the VA and the OSC rely upon the EEOC decision to terminate Dr. McLafferty. This is circular logic and at no point was Dr. McLafferty afforded an opportunity to present his side of the story or to respond to the evidence that was presented in those proceedings.

In *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798, 116 S. Ct. 1761, 1765 (1996), the Supreme Court explained the problem when an individual is held responsible for something that they had no ability to participate in during the underlying trial:

> The limits on a state court's power to develop
> estoppel rules reflect the general consensus "'in

> Anglo-American jurisprudence that one is not
> bound by a judgment in personam in a litigation
> in which he is not designated as a party or to
> which he has not been made a party by service
> of process.' This rule is part of our 'deep-rooted
> historic tradition that everyone should have his
> own day in court. As a consequence, "[a]
> judgment or decree among parties to a lawsuit
> resolves issues as among them, but it does
> not conclude the rights of strangers to those
> proceedings."

In the EEOC proceedings, Dr. McLafferty was a stranger. He was

not allowed to participate or offer his perspective. He is now being

bound by an adverse decision against the VA because of the VA's own

failures. This runs contrary to the concepts of due process and the basic

right of fairness.

### B. The VA completely failed to comply with its grievance procedure.

28 U.S.C. § 713 requires that a grievance mechanism be

established by the VA. At the time Dr. McLafferty was notified that his

employment was being terminated in 2019, he received a copy of

grievance procedure. *Supra*, p. 44-45. The law provides that Dr.

McLafferty is allowed to "grieve the action in accordance with an

internal grievance process that the Secretary . . . shall establish."

In enacting the law Congress intended that the grievance process was to move quickly and that the VA was to comply with the process that had been established. In this case the VA completely ignored its own grievance procedures.

The following is an abbreviated listing of procedural irregularities that transpired during the grievance process:

- Section 7(e) provides that upon the grievance reaching the decision official the grievance shall be referred to an examiner or for technical review within 10 days. 6-ER-1339. Dr. McLafferty filed his grievance on August 16, 2019. 5-ER-1103-06. He was not notified that the matter had been referred to a grievance examiner until September 26, 2019. 6-ER-1352.

- Section 12(a)(2)(d) provides that Dr. McLafferty was entitled to receive a copy of the letter appointing the grievance examiner. 6-ER-1343. No such letter was provided to Dr. McLafferty. Instead, Dr. McLafferty was notified by Andrea Smith that the matter had been assigned to Ms. Ross. 6-ER-1352.

- Section 12(e) provides that when the grievance examiner produces a report to the deciding official that Dr. McLafferty is also entitled to a copy of that report at the same time. 6-ER-1352. Dr. McLafferty, despite multiple requests for the grievance examiner's report, did not receive it until

the time Mr. Murphy made his decision. *Supra*, p. 51.

- Section 12(f) provides that the grievance examiner has 45 days from the date of appointment to issue a report. 6-ER-1344. Ms. Ross was appointed no later than September 26, 2019, and her report was not submitted until January 24, 2020. 1-ER-73.

- Section 13(b) provides that the deciding official has 15 days from the date of receipt of the report to issue a finding. 6-ER-1344. Mr. Murphy received the report on January 24, 2020, and didn't issue his decision until March 6, 2020. 1-ER-71-72.

Both the law and the grievance procedure are designed in such a way to ensure that the grievance process is to be quick and should be resolved promptly. The reasoning for this is because the pre-deprivation remedies that existed for employees like Dr. McLafferty before the law was enacted were much more robust. One of the tradeoffs envisioned by the law was that in allowing a facility to terminate a high-ranking employee without much pre-deprivation process, the employee would be entitled to a prompt resolution of his grievance after the fact. The law itself contemplates that the process is not to take more than 21 days. The VA completely ignored the process envisioned by Congress.

**II.   There is insufficient evidence that would allow a reasonable person to conclude that Dr. McLafferty violated the policies he was accused of violating.**

The VA's decision to terminate Dr. McLafferty cannot stand if it is not supported by substantial evidence. 38 U.S.C. § 713(b)(6). Here there is a complete dearth of evidence that Dr. McLafferty violated the rules he was alleged to have violated. The allegations ultimately break down into two different categories.

Before turning to the question of whether this Court finds that there is substantial evidence to support the VA's findings, it is critical to look at the standards that the VA relied upon in reaching its conclusions. As noted above, the VA relied almost exclusively upon the determinations of both the OSC and the EEOC. In *Rodriguez v. Department of Veterans Affairs*, 8 F.4th 1290, 1297 (Fed. Cir. 2021), the Court explained that, in the first instance, the VA must analyze the evidence supporting discharge using a preponderance of the evidence standard and not the substantial evidence standard. The VA never made clear what standard it was utilizing, however, given its reliance upon the determinations of the OSC and the EEOC without having even reviewed the evidence that supported those findings it is

impossible to see how the VA could have utilized the preponderance standard.

Dr. McLafferty is alleged to have violated VA conflict of interest rules. This charge stems from the attempts of Dr. McLafferty and others to get the Plastic Surgery call schedule under control. The VA contends that Dr. McLafferty engaged in a conflict of interest because he was "engaged in discussions with OHSU" and was "making recommendations to VA regarding entering a surgery call contract with OHSU." They contend that these actions violated both 5 C.F.R. § 2635.402 and the VHA Handbook, Section 1660.3. 3-ER-462-65.

The second category of allegations is that Dr. McLafferty retaliated against Dr. Wheatley in two separate respects. The VA contends that the "Service Chief Evaluation" that was performed on Dr. Wheatley was done in retaliation for Dr. Wheatley engaging in protected activity. The VA also contends that Dr. McLafferty's performance rating of Dr. Wheatley in October of 2014 was likewise retaliatory. Both instances, they contend, constituted a prohibited personnel practice under 5 U.S.C. § 2302(B)(1), (8), and/or (9).

The VA has insufficient evidence to support any of these claims.

## A.   Dr. McLafferty did not engage in a prohibited conflict of interest.

The VA contends that Dr. McLafferty's efforts related to OHSU entering into Plastic Surgery call contract with the VA constituted a conflict of interest because he both worked for the VA and held an appointment with OHSU.[24] The contention is that he "engaged in discussions with OHSU" about a call contract and that he made "recommendations to the VA" about entering into such a contract. 5 C.F.R. § 2635.402 generally provides that a government employee is prohibited from "participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the particular matter will have a direct and predictable effect on that interest." This is critical because it doesn't preclude any involvement, merely personal and substantial involvement. The regulation goes on to provide examples of what constitutes "personal and substantial participation":

---

[24] The charge limits the time frame of this supposed inappropriate conduct from November 2013 through October 2014. 3-ER-462. It is unclear what the basis is for this period of time.

Personal and substantial participation may occur when, for example, an employee participates through decision, approval, disapproval, recommendation, investigation, or the rendering of advice in a particular matter. 5 C.F.R. § 2635.402.

Section 1660.3 of the VA Handbook provides a little additional detail as to what actions when it comes to contracting are precluded:

a.  Drafting specifications or solicitations.

b.  Acting as a Contracting Officer's Technical Representative.

c.  Negotiating any parts of the contract, including price.

d.  Evaluating bids or proposals.

e.  Selecting or recommending the contractor.

f.  Reviewing, certifying, or approving the contract itself, or any award, modification, extension, specification, bid, proposal, payment voucher, time record, or any other document of significance to the contract.

g.  Reviewing or reporting time and attendance for contract administration purposes.

3-ER-478-79. Dr. McLafferty did none of these things.

The initial part of the VA's charge against Dr. McLafferty is that he "engaged in discussions with OHSU." There is nothing in the statute

69

or in the regulation that precludes him from having conversations with OHSU. Such a proposition would make little sense and would be completely inconsistent with how VHAPOR and the VHA operate. *Supra*, p. 34-36. Indeed, the contracting officials don't have the requisite knowledge to fully understand the needs of a medical service. This requires conversations between potential providers to understand what they might be able to provide.[25] Given that the VHAPOR HCS has an affiliate relationship with OHSU and that such a contract is preferred, it would be illogical for Dr. McLafferty not to have discussions with them about what they might be able to provide. Having these sorts of discussions is a far cry from the prohibited activities like drafting specifications and negotiating terms.

Not only would it be logical for Dr. McLafferty to engage in conversations with OHSU, he was specifically directed by all of his supervisors to have such discussion. *Supra*, p. 34-36. Dr. McLafferty was specifically directed as part of his goals for the 2013-2014 fiscal

---

[25] In 2016 the GAO issued a report regarding contracting with affiliates at the VHA. *See* GAO-16-426. The report explains that the VA "has a unique sole-source contracting authority that is available." *Id.* at 8.

year to work towards "partnerships and development of two new contracts with Neurosurgery and Plastic Surgery at OHSU for call coverage." 6-ER-1133.

The other part of the charge is that Dr. McLafferty made recommendations to the VA that they have a contract for Plastic Surgery call at OHSU. Had Dr. McLafferty done this it potentially might have been a violation of the rules. That having been said, there is no evidence that he ever did that. There is nothing in the record that would demonstrate that Dr. McLafferty made any such recommendation to anyone at the VA about contracting with OHSU. The opposite was true. Dr. McLafferty's supervisors directed him to engage in discussions with OHSU in an attempt to get OHSU to consider handling Plastic Surgery Call. *Supra*, p. 34-36. OHSU was reticent about entering into the relationship. Dr. McLafferty was not attempting to get the VA to agree to OHSU, he was trying – at the direction of his supervisors and of contracting – to get OHSU to come on board.[26]

---

[26] This point is demonstrated by VISN contracting official Michael Morrison's email where he mentions that they have attempted to get OHSU's involvement "dozens of times." 4-ER-643-44.

The VA's arguments that Dr. McLafferty engaged in a conflict of interest in his efforts to work towards a call contract with OHSU are off base. The record is replete with references to Dr. McLafferty's supervisors specifically directing him to work with OHSU to have discussions about these types of contracts. *Supra*, p. 39, n.19. With Plastic Surgery there was a very significant and dangerous issue and they needed call coverage. Dr. Anderson and Dr. Edwards had worked to get a resolution before Dr. McLafferty came on board and this included issuing requests for the community to submit bids. There was nothing that came of this. Dr. Anderson made it clear that he wanted Dr. McLafferty to reach out to the medical staff at OHSU to discuss these possibilities and that is what he did.

## B. There is nothing in the record that suggests that Dr. McLafferty retaliated against Dr. Wheatley.

The second set of charges against Dr. McLafferty alleges that he retaliated against Dr. Wheatley in two separate respects. First, they contend that the "Service Chief Evaluation" was a prohibited personnel practice because it was retaliatory. Second, they argue that that Dr. Wheatley's ranking of "Unacceptable" was retaliatory. 3-ER-462-63.

The only argument as to each of these claims that the VA has made is that there was suspicious timing. In other words, Dr. Wheatley filed his complaints and there is nothing else to explain the subsequent actions other than retaliation. This premise, however, is greatly flawed both factually and legally. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000)(noting that *post hoc ergo propter hoc* is a logical fallacy).

Dr. McLafferty learned of Dr. Wheatley's EEO complaint on May 2, 2014. 3-ER-492. If that claim enraged him the way the VA suggests, it seems pretty clear that he wouldn't have rated Dr. Wheatley as "fully successful" on May 6, 2014. 3-ER-507. Further, Dr. McLafferty didn't know that Dr. Wheatley had complained that he was engaged in a conflict of interest regarding OHSU until 2019. 2-ER-346.

Not only is the timing standing alone not sufficient, but there were intervening factors that occurred. In early October 2014 Dr. Wheatley completely dropped the day call schedule for Plastic Surgery. *Supra*, p. 22-24. Further, all of the statements that Dr. McLafferty made in either document were completely accurate.

1. **The "Service Chief Evaluation" was not retaliatory.**

In addition to the above reasons, there are other reasons why the allegations regarding the "Service Chief Evaluation" must fail. 3-ER-504. In order for something to constitute a "prohibited personnel practice" it must be both prohibited by statute and be done to retaliate against an employee who has engaged in a protected activity. 5 U.S.C. 2302. As to the Service Chief Evaluation form, even if Dr. McLafferty's reasoning for instituting it were to retaliate against Dr. Wheatley, it is not a prohibited personnel practice under the statute. *Id.*

A second problem with the VA's position is that they are far off base regarding what they are alleging. The charge doesn't even have the correct date. *Compare* 3-ER-504 (June 19, 2014) and 3-ER-462 (August 8, 2014). The charges that they bring claim that this form was used for the purpose of "obtaining privileges at other medical centers." 3-ER-462. They seem to be suggesting that Dr. McLafferty was spreading negative information about Dr. Wheatley to other medical centers. There is nothing in the record that would support this. For starters, there was nothing negative about Dr. Wheatley conveyed. Furthermore, the document was purely used for recredentialing at

VHAPOR HCS and was not something that was sent outside of the facility. *Supra*, p. 24-26. Further Dr. Wheatley never lost his privileges. This form had absolutely no impact.

Even if those two impediments to their argument didn't exist, from a factual perspective their argument falls apart. They have absolutely no evidence of retaliatory motive by Dr. McLafferty and they can't show that anything that Dr. McLafferty said on the form was factually inaccurate. 3-ER-504. The form asks the question of whether Dr. Wheatley had been suspended at any point in time. Dr. McLafferty simply answered that question truthfully by stating that there had been a "summary suspension/pause." 3-ER-504. This was an absolutely truthful statement.

## 2. The October 27, 2014, rating was not retaliatory.

For the reasons outlined above and as the district court properly found, the October 27, 2014, rating was not retaliatory. 1-ER-50-51. Digging deeper into the facts it becomes even more apparent that this was not retaliatory. Dr. McLafferty thoroughly outlined why he gave the evaluation that he gave. *Supra,* p. 22-27. Dr. Wheatley seriously endangered the health of veterans by dropping the day call schedule.

Dr. McLafferty was not alone in feeling this way. Indeed, before he provided the evaluation he spoke with his supervisor, Dr. Curl, to get her thoughts and she wholeheartedly concurred.

## III.    Even if Dr. McLafferty had violated any rules his termination was not appropriate.

It is clear that a decision was made that someone had to pay for the debacle of the *Wheatley* matter. Dr. McLafferty was not the appropriate target. Any of the allegations that have been brought against him in this matter are things that his supervisors were aware of and directed him to do. The actions that were consequential in the *Wheatley* matter were things that he had nothing to do with. If he did violate any rules, it was inadvertent. Further, while no employee is perfect, Dr. McLafferty's performance evaluations make it clear that he was an exceptional and highly valued employee.

At the grievance hearing Dr. Edwards testified at some length. He had a lengthy and rewarding career at the VA. He also had a keen insight into the issues involving Dr. Wheatley and into the relationship between OHSU and VHAPOR. Indeed, he had served in Dr. McLafferty's position as chief of surgery for a long time beforehand. At the conclusion of his testimony he was asked by Ms. Ross if he had

anything he wanted to add – he did. 2-ER-213-16. He expressed his

pride in VHAPOR and his service with the VA. He went on and

expressed the frustration he felt with what happened to Dr. McLafferty.

He explained that "substantial involvement" did not mean the directive

from the chief of staff that Dr. McLafferty "work with our academic

affiliate who is, . . . our preferred contractor." 2-ER-215. He explained

that the VA did not engage in a "good faith" effort to defend against Dr.

Wheatley's allegations and it was unconscionable that it was being held

against Dr. McLafferty. *Id.* He concluded by testifying that what

happened to Dr. McLafferty was one of the critical reasons he retired

when he did. *Id.*

Dr. Malinoski was asked the same question by Ms. Ross. He

expressed the same frustrations that Dr. Edwards voiced:

> I don't think it's easy to work here. I don't think
> it's easy to know what to do when. I think that
> you can have the right intentions and try to affect
> change in the right manner, and if the right steps
> aren't followed, it doesn't mean that that was
> done with intent.
>
> And we get very confusing guidance from HR all
> the time. And there are HR documents that are
> wrong, and they get -- they're left unchecked.
> There's documents that are wrong all over this

> facility, and they are just left alone because
> there's just too much to do.
>
> And so there are a lot of people that are doing
> things that they want to do that they think are
> right and best for the facility and best for patient
> care, and they don't always get clear guidance.
> And it's pretty ironic that -- that those processes
> aren't fixed but people are found to be the blame
> instead of the system which has a lot of
> challenges.

2-ER-133-34.

The reality is that the VA and the federal government are laced

with regulations and rules. No person can be expected to fully

understand every aspect of those rules and must rely upon others for

guidance. As it relates to all of the issues raised by the VA, Dr.

McLafferty consistently worked with his superiors and people at the

VISN contracting office to do things the way that they were supposed

to be done. His termination will do far more harm to the VA than good.

## CONCLUSION

For the foregoing reasons, McLafferty requests that this Court reverse the decision of the VA to terminate his employment and direct that he be reinstated and made whole.

*Dr. Robert McLafferty*
Dated:       OCTOBER 28, 2022

By:/s/ John A. Baker
       His Attorney

JOHN A. BAKER
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:       (217) 522-3445
Email:              jab@bbklegal.com

## CERTIFICATE OF SERVICE

This document was filed utilizing this Court's ECF system. A copy will automatically be served upon all counsel of record. No copies have been served via any alternative means of service.

*Dr. Robert McLafferty*
Dated:    OCTOBER 28, 2022

By:/s/ John A. Baker
      His Attorney

JOHN A. BAKER
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:    (217) 522-3445
Email:        jab@bbklegal.com

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35068

I am the attorney or self-represented party.

**This brief contains** | 13,729 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(X) complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [_____].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ John A. Baker | **Date** | October 28, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____22-35068_____

The undersigned attorney or self-represented party states the following:

[ X ]   I am unaware of any related cases currently pending in this court.

[  ]   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  /s/ John A. Baker          **Date** **October 28, 2022**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/18*

# ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 2302 — 2
Prohibited personnel practices

38 U.S.C. § 713 — 8
Senior executives: removal, demotion,
or suspension based on performance
or misconduct

5 C.F.R. § 2635.402 — 11
Disqualifying financial interests

VHA Handbook 1660.3 — 20
Conflict of Interest

**5 U.S.C. § 2302**
**Prohibited personnel practices**

* * * * *

**(b)** Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

    **(1)** discriminate for or against any employee or applicant for employment—

        **(A)** on the basis of race, color, religion, sex, or national origin, as prohibited under section 717 of the Civil Rights Act of 1964. 42 U.S.C. 2000e-16;

        **(B)** on the basis of age, as prohibited under sections 12 and 15 of the Age Discrimination in Employment Act of 1967. 29 U.S.C. 631, 633a;

        **(C)** on the basis of sex, as prohibited under section 6(d) of the Fair Labor Standards Act of 1938. 29 U.S.C. 206(d);

        **(D)** on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973. 29 U.S.C. 791; or

        **(E)** on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation;

    **(2)** solicit or consider any recommendation or statement, oral or written, with respect to any individual who requests or is under consideration for any personnel action unless such recommendation or statement is based on the personal knowledge or records of the person furnishing it and consists of—

        **(A)** an evaluation of the work performance, ability, aptitude, or general qualifications of such individual; or

Addendum 2

**(B)** an evaluation of the character, loyalty, or suitability of such individual;

**(3)** coerce the political activity of any person (including the providing of any political contribution or service), or take any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity;

**(4)** deceive or willfully obstruct any person with respect to such person's right to compete for employment;

**(5)** influence any person to withdraw from competition for any position for the purpose of improving or injuring the prospects of any other person for employment;

**(6)** grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment;

**(7)** appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement, in or to a civilian position any individual who is a relative (as defined in section 3110(a)(3) of this title) of such employee if such position is in the agency in which such employee is serving as a public official (as defined in section 3110(a)(2) of this title) or over which such employee exercises jurisdiction or control as such an official;

**(8)** take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

**(A)** any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

Addendum 3

**(i)** any violation of any law, rule, or regulation, or

**(ii)** gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs;

**(B)** any disclosure to the Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences—

**(i)** any violation (other than a violation of this section) of any law, rule, or regulation, or

**(ii)** gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; or

**(C)** any disclosure to Congress (including any committee of Congress) by any employee of an agency or applicant for employment at an agency of information described in subparagraph (B) that is—

**(i)** not classified; or

**(ii)** if classified—

**(I)** has been classified by the head of an agency that is not an element of the intelligence community (as defined by section 3 of the

Addendum 4

National Security Act of 1947. 50 U.S.C. 3003); and

   **(II)** does not reveal intelligence sources and methods.

**(9)** take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of—

   **(A)** the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation—

      **(i)** with regard to remedying a violation of paragraph (8); or

      **(ii)** other than with regard to remedying a violation of paragraph (8);

   **(B)** testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A)(i) or (ii);

   **(C)** cooperating with or disclosing information to the Inspector General (or any other component responsible for internal investigation or review) of an agency, or the Special Counsel, in accordance with applicable provisions of law; or

   **(D)** refusing to obey an order that would require the individual to violate a law, rule, or regulation;

**(10)** discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others; except that nothing in this paragraph shall prohibit an agency from taking into account in determining suitability or fitness any conviction of the employee or applicant

for any crime under the laws of any State, of the District of Columbia, or of the United States;

**(11)**

    **(A)** knowingly take, recommend, or approve any personnel action if the taking of such action would violate a veterans' preference requirement; or

    **(B)** knowingly fail to take, recommend, or approve any personnel action if the failure to take such action would violate a veterans' preference requirement;

**(12)** take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title;

**(13)** implement or enforce any nondisclosure policy, form, or agreement, if such policy, form, or agreement—

    **(A)** does not contain the following statement: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling."; or

    **(B)** prohibits or restricts an employee or applicant for employment from disclosing to Congress, the Special Counsel, the Inspector General of an agency, or any other

Addendum 6

agency component responsible for internal investigation or review any information that relates to any violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or any other whistleblower protection; or

**(14)** access the medical record of another employee or an applicant for employment as a part of, or otherwise in furtherance of, any conduct described in paragraphs (1) through (13).

This subsection shall not be construed to authorize the withholding of information from Congress or the taking of any personnel action against an employee who discloses information to Congress. For purposes of paragraph (8), (i) any presumption relating to the performance of a duty by an employee whose conduct is the subject of a disclosure as defined under subsection (a)(2)(D) may be rebutted by substantial evidence, and (ii) a determination as to whether an employee or applicant reasonably believes that such employee or applicant has disclosed information that evidences any violation of law, rule, regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety shall be made by determining whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee or applicant could reasonably conclude that the actions of the Government evidence such violations, mismanagement, waste, abuse, or danger.

**38 U.S.C. § 713**
**Senior executives: removal, demotion, or suspension based on performance or misconduct**

**(a) Authority.—**

  **(1)** The Secretary may, as provided in this section, reprimand or suspend, involuntarily reassign, demote, or remove a covered individual from a senior executive position at the Department if the Secretary determines that the misconduct or performance of the covered individual warrants such action.

  **(2)** If the Secretary so removes such an individual, the Secretary may remove the individual from the civil service (as defined in section 2101 of title 5).

**(b) Rights and procedures.—**

  **(1)** A covered individual who is the subject of an action under subsection (a) is entitled to—

    **(A)** advance notice of the action and a file containing all evidence in support of the proposed action;

    **(B)** be represented by an attorney or other representative of the covered individual's choice; and

    **(C)** grieve the action in accordance with an internal grievance process that the Secretary, in consultation with the Assistant Secretary for Accountability and Whistleblower Protection, shall establish for purposes of this subsection.

  **(2)**

**(A)** The aggregate period for notice, response, and decision on an action under subsection (a) may not exceed 15 business days.

**(B)** The period for the response of a covered individual to a notice under paragraph (1)(A) of an action under subsection (a) shall be 7 business days.

**(C)** A decision under this paragraph on an action under subsection (a) shall be issued not later than 15 business days after notice of the action is provided to the covered individual under paragraph (1)(A). The decision shall be in writing, and shall include the specific reasons therefor.

**(3)** The Secretary shall ensure that the grievance process established under paragraph (1)(C) takes fewer than 21 days.

**(4)** A decision under paragraph (2) that is not grieved, and a grievance decision under paragraph (3), shall be final and conclusive.

**(5)** A covered individual adversely affected by a decision under paragraph (2) that is not grieved, or by a grievance decision under paragraph (3), may obtain judicial review of such decision.

**(6)** In any case in which judicial review is sought under paragraph (5), the court shall review the record and may set aside any Department action found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with a provision of law;

**(B)** obtained without procedures required by a provision of law having been followed; or

**(C)** unsupported by substantial evidence.

**(c) Relation to other provisions of law.**--Section 3592(b)(1) of title 5 and the procedures under section 7543(b) of such title do not apply to an action under subsection (a).

**(d) Definitions.**--In this section:

    **(1)** The term "covered individual" means—

        **(A)** a career appointee (as that term is defined in section 3132(a)(4) of title 5); or

        **(B)** any individual who occupies an administrative or executive position and who was appointed under section 7306(a), section 7401(1), or section 7401(4) of this title.

    **(2)** The term "misconduct" includes neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function.

    **(3)** The term "senior executive position" means—

        **(A)** with respect to a career appointee (as that term is defined in section 3132(a) of title 5), a Senior Executive Service position (as such term is defined in such section); and

        **(B)** with respect to a covered individual appointed under section 7306(a) or section 7401(1) of this title, an administrative or executive position.

**5 C.F.R. § 2635.402**
**Disqualifying financial interests**

**(a) Statutory prohibition.** An employee is prohibited by criminal statute, 18 U.S.C. 208(a), from participating personally and substantially in an official capacity in any particular matter in which, to his knowledge, he or any person whose interests are imputed to him under this statute has a financial interest, if the particular matter will have a direct and predictable effect on that interest.

Note: Standards applicable when seeking non-Federal employment are contained in subpart F of this part and, if followed, will ensure that an employee does not violate 18 U.S.C. 208(a) or this section when he is negotiating for or has an arrangement concerning future employment. In all other cases where the employee's participation would violate 18 U.S.C. 208(a), an employee shall disqualify himself from participation in the matter in accordance with paragraph (c) of this section or obtain a waiver or determine that an exemption applies, as described in paragraph (d) of this section.

**(b) Definitions.** For purposes of this section, the following definitions shall apply:

(1) Direct and predictable effect.

(i) A particular matter will have a direct effect on a financial interest if there is a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest. An effect may be direct even though it does not occur immediately. A particular matter will not have a direct effect on a financial interest, however, if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter. A particular matter that has an effect on a financial interest only as a consequence of its effects on the general economy does not have a direct effect within the meaning of this subpart.

Addendum 11

(ii) A particular matter will have a predictable effect if there is a real, as opposed to a speculative possibility that the matter will affect the financial interest. It is not necessary, however, that the magnitude of the gain or loss be known, and the dollar amount of the gain or loss is immaterial.

Note: If a particular matter involves a specific party or parties, generally the matter will at most only have a direct and predictable effect, for purposes of this subpart, on a financial interest of the employee in or with a party, such as the employee's interest by virtue of owning stock. There may, however, be some situations in which, under the above standards, a particular matter will have a direct and predictable effect on an employee's financial interests in or with a nonparty. For example, if a party is a corporation, a particular matter may also have a direct and predictable effect on an employee's financial interests through ownership of stock in an affiliate, parent, or subsidiary of that party. Similarly, the disposition of a protest against the award of a contract to a particular company may also have a direct and predictable effect on an employee's financial interest in another company listed as a subcontractor in the proposal of one of the competing offerors.

Example 1: An employee of the National Library of Medicine at the National Institutes of Health has just been asked to serve on the technical evaluation panel to review proposals for a new library computer search system. DEF Computer Corporation, a closely held company in which he and his wife own a majority of the stock, has submitted a proposal. Because award of the systems contract to DEF or to any other offeror will have a direct and predictable effect on both his and his wife's financial interests, the employee cannot participate on the technical evaluation team unless his disqualification has been waived.

Example 2: Upon assignment to the technical evaluation panel, the employee in the preceding example finds that

DEF Computer Corporation has not submitted a proposal. Rather, LMN Corp., with which DEF competes for private sector business, is one of the six offerors. The employee is not disqualified from serving on the technical evaluation panel. Any effect on the employee's financial interests as a result of the agency's decision to award or not award the systems contract to LMN would be at most indirect and speculative.

(2) Imputed interests. For purposes of 18 U.S.C. 208(a) and this subpart, the financial interests of the following persons will serve to disqualify an employee to the same extent as if they were the employee's own interests:

(i) The employee's spouse;

(ii) The employee's minor child;

(iii) The employee's general partner;

(iv) An organization or entity which the employee serves as officer, director, trustee, general partner or employee; and

(v) A person with whom the employee is negotiating for or has an arrangement concerning prospective employment. (Employees who are seeking other employment should refer to and comply with the standards in subpart F of this part).

Example 1: An employee of the Department of Education serves without compensation on the board of directors of Kinder World, Inc., a nonprofit corporation that engages in good works. Even though her personal financial interests will not be affected, the employee must disqualify herself from participating in the review of a grant application submitted by Kinder World. Award or denial of the grant will affect the financial interests of Kinder World and its financial interests are imputed to her as a member of its board of directors.

Example 2: The spouse of an employee of the Food and Drug Administration has obtained a position with a well established biomedical research company. The company has developed an artificial limb for which it is seeking FDA approval and the employee would ordinarily be asked to participate in the FDA's review and approval process. The spouse is a salaried employee of the company and has no direct ownership interest in the company. Nor does she have an indirect ownership interest, as would be the case, for example, if she were participating in a pension plan that held stock in the company. Her position with the company is such that the granting or withholding of FDA approval will not have a direct and predictable effect on her salary or on her continued employment with the company. Since the FDA approval process will not affect his spouse's financial interests, the employee is not disqualified under § 2635.402 from participating in that process. Nevertheless, the financial interests of the spouse's employer may be disqualifying under the impartiality principle, as implemented at § 2635.502.

(3) Particular matter. The term particular matter encompasses only matters that involve deliberation, decision, or action that is focused upon the interests of specific persons, or a discrete and identifiable class of persons. Such a matter is covered by this subpart even if it does not involve formal parties and may include governmental action such as legislation or policy-making that is narrowly focused on the interests of such a discrete and identifiable class of persons. The term particular matter, however, does not extend to the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons. The particular matters covered by this subpart include a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation or arrest.

Example 1: The Internal Revenue Service's amendment of its regulations to change the manner in which depreciation is

calculated is not a particular matter, nor is the Social Security Administration's consideration of changes to its appeal procedures for disability claimants.

Example 2: Consideration by the Interstate Commerce Commission of regulations establishing safety standards for trucks on interstate highways involves a particular matter.

(4) Personal and substantial. To participate personally means to participate directly. It includes the direct and active supervision of the participation of a subordinate in the matter. To participate substantially means that the employee's involvement is of significance to the matter. Participation may be substantial even though it is not determinative of the outcome of a particular matter. However, it requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. A finding of substantiality should be based not only on the effort devoted to a matter, but also on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participating in a critical step may be substantial. Personal and substantial participation may occur when, for example, an employee participates through decision, approval, disapproval, recommendation, investigation or the rendering of advice in a particular matter.

**(c) Disqualification.** Unless the employee is authorized to participate in the particular matter by virtue of a waiver or exemption described in paragraph (d) of this section or because the interest has been divested in accordance with paragraph (e) of this section, an employee shall disqualify himself from participating in a particular matter in which, to his knowledge, he or a person whose interests are imputed to him has a financial interest, if the particular matter will have a direct and predictable effect on that interest. Disqualification is accomplished by not participating in the particular matter.

(1) Notification. An employee who becomes aware of the need to disqualify himself from participation in a particular matter to

which he has been assigned should notify the person responsible for his assignment. An employee who is responsible for his own assignment should take whatever steps are necessary to ensure that he does not participate in the matter from which he is disqualified. Appropriate oral or written notification of the employee's disqualification may be made to coworkers by the employee or a supervisor to ensure that the employee is not involved in a matter from which he is disqualified.

(2) Documentation. An employee need not file a written disqualification statement unless he is required by part 2634 of this chapter to file written evidence of compliance with an ethics agreement with the Office of Government Ethics or is asked by an agency ethics official or the person responsible for his assignment to file a written disqualification statement. However, an employee may elect to create a record of his actions by providing written notice to a supervisor or other appropriate official.

Example 1: An Assistant Secretary of the Department of the Interior owns recreational property that borders on land which is being considered for annexation to a national park. Annexation would directly and predictably increase the value of her vacation property and, thus, she is disqualified from participating in any way in the Department's deliberations or decisions regarding the annexation. Because she is responsible for determining which matters she will work on, she may accomplish her disqualification merely by ensuring that she does not participate in the matter. Because of the level of her position, however, the Assistant Secretary might be wise to establish a record that she has acted properly by providing a written disqualification statement to an official superior and by providing written notification of the disqualification to subordinates to ensure that they do not raise or discuss with her any issues related to the annexation.

**(d) Waiver of or exemptions from disqualification.** An employee who would otherwise be disqualified by 18 U.S.C. 208(a) may be permitted to participate in a particular matter where the otherwise disqualifying financial interest is the subject of a regulatory exemption

or individual waiver described in this paragraph, or results from certain Indian birthrights as described in 18 U.S.C. 208(b)(4).

(1) Regulatory exemptions. Under 18 U.S.C. 208(b)(2), regulatory exemptions of general applicability have been issued by the Office of Government Ethics, based on its determination that particular interests are too remote or too inconsequential to affect the integrity of the services of employees to whom those exemptions apply. See the regulations in subpart B of part 2640 of this chapter, which supersede any preexisting agency regulatory exemptions.

(2) Individual waivers. An individual waiver enabling the employee to participate in one or more particular matters may be issued under 18 U.S.C. 208(b)(1) if, in advance of the employee's participation:

(i) The employee:

(A) Advises the Government official responsible for the employee's appointment (or other Government official to whom authority to issue such a waiver for the employee has been delegated) about the nature and circumstances of the particular matter or matters; and

(B) Makes full disclosure to such official of the nature and extent of the disqualifying financial interest; and

(ii) Such official determines, in writing, that the employee's financial interest in the particular matter or matters is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such employee. See also subpart C of part 2640 of this chapter, for additional guidance.

(3) Federal advisory committee member waivers. An individual waiver may be issued under 18 U.S.C. 208(b)(3) to a special Government employee serving on, or under consideration for

appointment to, an advisory committee within the meaning of the Federal Advisory Committee Act if the Government official responsible for the employee's appointment (or other Government official to whom authority to issue such a waiver for the employee has been delegated):

> (i) Reviews the financial disclosure report filed by the special Government employee pursuant to the Ethics in Government Act of 1978; and

> (ii) Certifies in writing that the need for the individual's services outweighs the potential for a conflict of interest created by the otherwise disqualifying financial interest. See also subpart C of part 2640 of this chapter, for additional guidance.

(4) Consultation and notification regarding waivers. When practicable, an official is required to consult formally or informally with the Office of Government Ethics prior to granting a waiver referred to in paragraph (d)(2) or (3) of this section. A copy of each such waiver is to be forwarded to the Director of the Office of Government Ethics.

**(e) Divestiture of a disqualifying financial interest.** Upon sale or other divestiture of the asset or other interest that causes his disqualification from participation in a particular matter, 18 U.S.C. 208(a) and paragraph (c) of this section will no longer prohibit the employee's participation in the matter.

> (1) Voluntary divestiture. An employee who would otherwise be disqualified from participation in a particular matter may voluntarily sell or otherwise divest himself of the interest that causes the disqualification.

> (2) Directed divestiture. An employee may be required to sell or otherwise divest himself of the disqualifying financial interest if his continued holding of that interest is prohibited by statute or by agency supplemental regulation issued in accordance with §

2635.403(a), or if the agency determines in accordance with §
2635.403(b) that a substantial conflict exists between the financial
interest and the employee's duties or accomplishment of the
agency's mission.

(3) Eligibility for special tax treatment. An employee who is
directed to divest an interest may be eligible to defer the tax
consequences of divestiture under subpart J of part 2634 of this
chapter. An employee who divests before obtaining a certificate of
divestiture will not be eligible for this special tax treatment.

**(f) Official duties that give rise to potential conflicts.** Where an
employee's official duties create a substantial likelihood that the
employee may be assigned to a particular matter from which he is
disqualified, the employee should advise his supervisor or other person
responsible for his assignments of that potential so that conflicting
assignments can be avoided, consistent with the agency's needs.

**CORRECTED COPY**

| | |
|---|---|
| Department of Veterans Affairs | **VHA HANDBOOK 1660.03** |
| Veterans Health Administration | **Transmittal Sheet** |
| Washington, DC 20420 | **September 22, 2008** |

**CONFLICT OF INTEREST ASPECTS OF CONTRACTING FOR SCARCE
MEDICAL SPECIALIST SERVICES, ENHANCED USE LEASES, HEALTH CARE
RESOURCE SHARING, FEE BASIS AND INTERGOVERNMENTAL PERSONNEL
ACT AGREEMENTS (IPAS)**

**1. REASON FOR ISSUE.** This Veterans Health Administration (VHA) Handbook is being re-issued without significant changes to permit recertification of the policy. It contains procedures regarding conflict of interest aspects of Scarce Medical Specialist Service (SMSS) contracts and Health Care Resource Sharing (HCRS) agreements, Intergovernmental Personnel Act (IPA) agreements, Enhanced Use Leases, and Fee Basis agreements which apply to all VHA organizational elements.

**2. SUMMARY OF MAJOR CHANGES.** The organizational responsibility changed from the Office of the Chief Financial Officer (17), Medical Sharing Office (176B) to the VHA Procurement and Logistics Office (10F).

**3. RELATED DIRECTIVE.** VHA Directive 1660.1.

**4. RESPONSIBLE OFFICE.** The VHA Procurement and Logistics Office (10F), is responsible for the contents of this VHA Handbook.

**5. RESCISSIONS.** VHA Handbook 1660.3, dated July 24, 2002, is rescinded.

**6. RECERTIFICATION.** This VHA Handbook is scheduled for recertification on or before the last working day of September 2013.


Michael J. Kussman, MD, MS, MACP
Under Secretary for Health

DISTRIBUTION: CO: E-mailed 9/25/2008
FLD: VISN, MA, DO, OC, OCRO, and 200 – E-mailed 9/25/2008

T-1

September 22, 2008          CORRECTED COPY          VHA HANDBOOK 1660.03

## CONTENTS

**CONFLICT OF INTEREST ASPECTS OF CONTRACTING FOR SCARCE MEDICAL
SPECIALIST SERVICES, HEALTH CARE RESOURCE SHARING,
INTERGOVERNMENTAL PERSONNEL ACT AGREEMENTS (IPAs), ENHANCED
USE AGREEMENTS AND FEE BASIS AGREEMENTS**

**PARAGRAPH**                                                                 **PAGE**

1. Purpose.................................................................................................................. 1

2. Background ............................................................................................................ 1

3. Scope of Conflict of Interest ................................................................................ 1

4. Responsibility ....................................................................................................... 1

5. Explanation of Federal Criminal Statute ............................................................. 2

6. Specific Activities Prohibited .............................................................................. 2

7. Specific Activities Permissible ............................................................................ 3

8. Determination by Regional Counsel .................................................................... 4

**APPENDIX**

A Acknowledgment Form ........................................................................................ A-1

i

September 22, 2008          **CORRECTED COPY**          VHA HANDBOOK 1660.03

**CONFLICT OF INTEREST ASPECTS OF CONTRACTING FOR SCARCE
MEDICAL SPECIALIST SERVICES, ENHANCED USE LEASES, HEALTH CARE
RESOURCE SHARING, FEE BASIS AND INTERGOVERNMENTAL PERSONNEL
ACT AGREEMENTS (IPAS)**

**1. PURPOSE**

   This Veterans Health Administration (VHA) Handbook provides procedures for avoiding conflict of interest problems associated with Scarce Medical Specialist Services (SMSS) contracts authorized by Title 38 United States Code (U.S.C.) 7409, Health Care Resource Sharing (HCRS) agreements authorized by 38 U.S.C. 8153, Enhanced Use Leases, 38 U.S.C. Section 8162, Subchapter V, Enhanced-Use Leases of Real Property, August 14, 1991, as amended by Public Law 102-86; Intergovernmental Personnel Act (IPA) agreements, and Fee Basis agreements, 38 U.S.C. 1703.

**2. BACKGROUND**

   General Accounting Office (GAO) and Office of Inspector General (OIG) investigations of VHA practices in the area of scarce medical specialist services contracting reported that some physician supervisors and managers stated they did not know about the applicable conflict of interest rules. GAO and OIG investigators found violations of these rules. In September 1993, in order to correct this problem, VHA issued Directive 10-93-119 that detailed procedures for avoiding conflict of interest problems associated with this type of contracting. This Directive expired September 1995, without notice. Subsequently, during a routine audit of the Ethics Program at the Department of Veterans Affairs (VA) Central Office, the auditors noted the 1993 Directive had expired. It was recommended and agreed that VHA needed to have on record a permanent policy and procedures statement covering this aspect of business.

**3. SCOPE OF CONFLICT OF INTEREST**

   A Government employee who is employed by a contractor is prohibited from participating personally and substantially on behalf of the Government through decision, approval, disapproval, recommendation, rendering of advice, certifying for payment or otherwise in that contract. No VA employee who is an employee, officer, director, or trustee of an affiliated university, or who has a financial interest in the contract, may lawfully participate in a VA contract or any other Government contract with the university. VHA is committed to adhering to and enforcing all applicable laws and regulations concerning employee conflicts of interest. *Authority: Title 18 U.S.C. Section 208(a), and Title 5 Code of Federal Regulations (CFR) Section 2635.402.*

**4. RESPONSIBILITY**

   Facility Directors must ensure that each Chief of Staff and each physician, clinician or allied health supervisor, or manager, receives a copy of VHA Handbook 1660.3, and

1

**ADDENDUM 23**

**VHA HANDBOOK 1660.03**        **CORRECTED COPY**        September 22, 2008

VA Form 10-21009 (NR), Acknowledge Form (see App. A). A copy of the letter and the signed acknowledgment must be placed on the right side of the clinician's Official Personnel Folder. This action applies to all paid physician or allied health supervisors and managers, as well as to any physicians or clinicians who assume supervisory or managerial duties in the future.

## 5. EXPLANATION OF FEDERAL CRIMINAL STATUTE

a. A Federal criminal statute prohibits a Government employee, whether full-time, part-time, or a special Government employee, from participating personally and substantially in a particular matter in which the employee, to the employee's knowledge, has a financial interest, if the particular matter would directly and predictably affect that financial interest (see 18 U.S.C. Section 208(a) and 5 CFR Section 2635.402). In addition to the employee's own financial interests, the statute imputes to the employee as a personal financial interest for purposes of this restriction, the financial interests of the employee's spouse, minor children, general partners, and any organization which the employee serves as officer, director, trustee, general partner, or employee. The law also imputes to the employee the financial interests of a person or organization with which the employee is negotiating for employment or has an arrangement for prospective employment.

b. A contract is a particular matter. Specific payment vouchers on the contract are also particular matters. The financial interest is directly and predictably affected by the particular matter whenever there is a close casual link between any official decision or action to be taken in the matter and any expected effect (i.e., gain or loss) on the financial interest. Personal and substantial participation is direct action, which is of significance to the matter. This statute applies to all VA employees, all particular matters, and all covered financial interests. *NOTE: The conflict of interest restriction here is given in the context of SMSS, HCRS contracts, IPA agreements, Enhanced Use Lease and Fee Basis agreements because this area has produced concerns in the past. The prohibition summarized in the previous paragraph may arise in other VA contexts as well. Other laws and regulations, such as the procurement integrity statute and the standards of conduct, may apply to specific conduct.*

c. If a VA Chief of Staff, service chief, or other VA employee has a financial interest in a contract between VA and an affiliated medical school, including employment by the school or negotiation for prospective employment with the school, the statute prohibits that employee from taking official action on behalf of VA which is "personal and substantial" on the contract between VA and the medical school. This prohibition applies even though the individual physician or clinician may not gain or lose financially from the contract between VA and the medical school, because the financial interest of the school (which is imputed to the employee by law) is affected by the contract.

## 6. SPECIFIC ACTIVITIES PROHIBITED

The following specific activities, to the extent applicable, as to a SMSS, HCRS, IPA agreements Enhanced Use Leases and Fee Basis contracts for which the affiliated medical school is likely to be a provider are <u>prohibited</u> for a VA physician or clinician who has a financial interest in the contract (including the imputed interests discussed):

2

September 22, 2008          **CORRECTED COPY**          **VHA HANDBOOK 1660.03**

    a.  Drafting specifications or solicitations.

    b.  Acting as Contracting Officer's Technical Representative (COTR).

    c.  Negotiating any parts of the contract, including price.

    d.  Evaluating bids or proposals.

    e.  Selecting or recommending the contractor.

    f.  Reviewing, certifying, or approving the contract itself, or any award, modification, extension, specification, bid, proposal, payment voucher, time record, or any other document of significance to the contract.

    g.  Reviewing or reporting time and attendance for contract administration purposes.

*NOTE:  These prohibitions also apply to any non-affiliated entity in which a VA employee has a financial interest.*

## 7.  SPECIFIC ACTIVITIES PERMISSIBLE

    The following specific activities are permissible by a VA physician or clinician who has a financial interest in the contract (including the imputed interests discussed).

    a.  Supervising professional services provided under the contract solely for purposes of ensuring quality of care.

    b.  Developing workload projections, so long as such projections are developed independently of the contract for purposes of operating the VA facility and not developed for purposes of contract specification or for contract renewal.

    c.  Providing direct patient care within VA responsibilities.

    d.  Performing oversight and administration within the employee's VA responsibilities, including record keeping, and quality assurance activities conducted as part of medical facility operations.

    e.  Participating in any manner in any particular matter in which neither the employee nor the school has a financial interest, (e.g., acting as COTR in another contract which does not involve the physician's or clinician's outside employer).

3

**ADDENDUM 25**

f. Engaging in permissible outside activities, such as approved teaching by a full-time employee.

## 8. DETERMINATION BY REGIONAL COUNSEL

Whether or not an employee has a financial interest in a contract, including an employment or prospective employment relationship with affiliated medical schools, health care providers, health care plans, insurers, and/or any organizations, institutions or other entities or individuals who furnish health care resources, which disqualifies the employee from participating in a SMSS HCRS, IPA, Enhanced Use Lease and Fee Basis contract, necessarily involves a case-by-case determination by Regional Counsel. Generally, if the physician or clinician has a faculty appointment and receives any compensation, or is under the direction of the school, the physician or clinician has at least an imputed financial interest in VA contracts with the school. VHA requires a written opinion from Regional Counsel that an "affiliated" physician or clinician may lawfully participate in the contract before the participation occurs (see VHA Manual M-1, Pt. I, Ch. 34, subpar. 34.01f). The permissible activities described in paragraph 7 are not "participation" in the contract for purposes of the statute.

**NOTE:** *Call the local Regional Counsel or, in Central Office, call the Assistant General Counsel (023) for further explanation or advice. VA ethics officials are available in either office to provide specific advice.*

4

**ADDENDUM 26**